Volume 1 of 2

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

AHMED OMAR ABU ALI, a/k/a Reda,
a/k/a Hani, a/k/a Abi Umar, a/k/a
Ashraf, a/k/a Abu Abdullah,
*Defendant-Appellant.*

No. 06-4334

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

AHMED OMAR ABU ALI, a/k/a Reda,
a/k/a Hani, a/k/a Abi Umar, a/k/a
Ashraf, a/k/a Abu Abdullah,
*Defendant-Appellee.*

No. 06-4521

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:05-cr-00053-GBL)

Argued: June 21, 2007

Decided: June 6, 2008

Before WILKINSON, MOTZ, and TRAXLER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson, Judge Motz, and Judge Traxler wrote a joint opinion in this case. Judge Wilkinson and Judge Traxler join the opinion in its entirety. Judge Motz joins the opinion with the exception of footnote 5 and Section VII, as to which she has written a dissenting statement and opinion.

---

**COUNSEL**

**ARGUED:** Joshua Lewis Dratel, New York, New York, for Ahmed Omar Abu Ali, Appellant/Cross-Appellee. David Howard Laufman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for the United States, Appellee/Cross-Appellant. **ON BRIEF:** Joseph Margulies, UNIVERSITY OF CHICAGO LAW SCHOOL, Chicago, Illinois, for Ahmed Omar Abu Ali, Appellant/Cross-Appellee. Chuck Rosenberg, United States Attorney, Stephen M. Campbell, Assistant United States Attorney, Marla B. Tusk, Trial Attorney, Department of Justice, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for the United States, Appellee/Cross-Appellant.

---

**OPINION**

WILKINSON, MOTZ, and TRAXLER, Circuit Judges:

Ahmed Omar Abu Ali was convicted by a jury of nine criminal counts arising from his affiliation with an al-Qaeda terrorist cell located in Medina, Saudi Arabia, and its plans to carry out a number of terrorist acts in this country. He was sentenced by the district court to 360 months imprisonment and 360 months of supervised release following imprisonment. Abu Ali appeals his convictions and the government cross-appeals his sentence. For the following reasons, we affirm the conviction, but we vacate and remand for purposes of resentencing.

Unlike some others suspected of terrorist acts and designs upon the United States, Abu Ali was formally charged and tried according to

the customary processes of the criminal justice system. Persons of good will may disagree over the precise extent to which the formal criminal justice process must be utilized when those suspected of participation in terrorist cells and networks are involved. There should be no disagreement, however, that the criminal justice system does retain an important place in the ongoing effort to deter and punish terrorist acts without the sacrifice of American constitutional norms and bedrock values. As will be apparent herein, the criminal justice system is not without those attributes of adaptation that will permit it to function in the post-9/11 world. These adaptations, however, need not and must not come at the expense of the requirement that an accused receive a fundamentally fair trial. In this case, we are satisfied that Abu Ali received a fair trial, though not a perfect one, and that the criminal justice system performed those functions which the Constitution envisioned for it. The three of us unanimously express our conviction that this is so in this opinion, which we have jointly authored.

Some differences do exist, however, among the panel members. Judge Wilkinson and Judge Traxler join in the opinion in its entirety. Judge Motz dissents (in footnote 6) from the majority's holding that the interrogation of Abu Ali on June 15, 2003, did not constitute a joint venture between law enforcement officers of Saudi Arabia and those of the United States. Judge Motz likewise dissents from Section VII of the panel's opinion, which directs that the case be remanded to the district court for the purposes of resentencing.

I.

A.

Abu Ali is an American citizen. He was born in Texas and raised in Falls Church, Virginia by his mother and father, the latter of whom was employed at the Royal Embassy of Saudi Arabia in Washington, D.C. After graduating from the Saudi Islamic Academy in Virginia, Abu Ali studied for one semester at the University of Maryland and then enrolled in the Institute in Virginia to study Islamic Sciences.

In September 2002, at the age of 21, Abu Ali left his home in Falls Church, Virginia and traveled to Saudi Arabia to study at the Islamic University in Medina. Within a few months of his arrival in Medina,

Abu Ali contacted Moeith al-Qahtani ("al-Qahtani"). Abu Ali and al-Qahtani had become friends two years earlier when Abu Ali attended an Islamic summer study session in Saudi Arabia and, upon his return to Saudi Arabia, Abu Ali renewed the friendship. The two "often talked about jihad" and, in November 2002, al-Qahtani introduced Abu Ali to Sultan Jubran Sultan al-Qahtani ("Sultan Jubran"), who was also known by the name of "Ali."[1] Sultan Jubran had been a mujahid soldier during the United States bombing of Tora Bora in Afghanistan (a major battle between al-Qaeda/Taliban forces and United States forces during the Afghanistan invasion) and, when introduced to Abu Ali, was second-in-command of an al-Qaeda cell in Medina. Abu Ali "accepted and liked the idea" of meeting the "mujahid brother." After their introduction, he and Sultan Jubran also talked "about the virtues of jihad" and exchanged cell phone numbers to keep in touch.

In the ensuing months, Abu Ali and Sultan Jubran continued their discussions. During one such meeting, Sultan Jubran questioned Abu Ali "about gathering and crowded places" in the United States. Abu Ali, who "understood the implication of his question," informed Sultan Jubran that these "would be amusement parks . . . and stadiums." At one point, when Abu Ali was unsuccessful in contacting Sultan Jubran by cell phone, he obtained the latter's email address from al-Qahtani and sent Sultan Jubran a message asking that he be contacted. Shortly thereafter, Sultan Jubran did contact Abu Ali and the two men met again in Jiddah, Saudi Arabia, which is just to the south of Medina. At this meeting, Sultan Jubran urged Abu Ali to engage in jihad against America. According to Abu Ali, Sultan Jubran "told me that they had something to do" and "asked [me] to be ready to join them in working against America." Abu Ali "immediately accepted, because of my hatred of the [United States] for what I felt was its support of Israel against the Palestinian people, and because I was originally from Jerusalem."

Later, Sultan Jubran advised Abu Ali that Abu Ali would soon be meeting "the person in charge of the organization." According to Abu Ali, Sultan Jubran "explained to me that I was one of them now, and

---

[1]Jihad is "a holy war undertaken as a sacred duty by Muslims." Webster's Unabridged Dictionary 1029 (2d ed. 2001).

that I could speak in the name of al-Qaeda." A few days later, Sultan Jubran arranged a meeting between himself, Abu Ali, and Ali Abd al-Rahman al-Faq'asi al-Ghamdi ("al-Faq'asi"), the leader or "brother in charge" of the al-Qaeda terrorist cell in Medina, who was also known by the name of "Adil. "

Abu Ali and al-Faq'asi met a number of times thereafter to discuss the Medina cell's plans for jihad. More specifically, al-Faq'asi advised Abu Ali that an assignment was planned inside the United States and the two men discussed and considered a number of alternatives for terrorist attacks within the United States. According to Abu Ali, al-Faq'asi "presented me with two ideas, based on the fact that I was a [United States] citizen and that I had not engaged in jihad before." "The first idea was to carry out a major operation that he would arrange." The second was "that I would go to the [United States], settle down, find work, lead a normal life, blend into American society and marry a Christian," which would allow him to "plan successive operations inside the [United States] for which . . . al-Faq'asi would send individuals to carry out." In other words, Abu Ali, who was a United States citizen able to return at will and move freely about in the country, would marry a Christian woman, live an overtly normal life to deflect attention, establish a sleeper cell within this country, and prepare for operation instructions and additional operatives to assist.

After this introduction to al-Faq'asi, Abu Ali "became directly connected" to the leader of the cell and "stopped seeing or hearing from Sultan" Jubran. However, he "continued to meet . . . al-Faq'asi in various places" and "discuss[ed] how to carry out the assignment in the [United States]." According to Abu Ali, he met with al-Faq'asi on six separate occasions to plan such terrorist operations within the United States. In the course of these meetings, Abu Ali suggested assassinations or kidnappings of members of the United States Senate, the United States Army, and the Bush Administration, a plan to rescue the prisoners at Guantanamo Bay, and plans to blow up American warplanes on United States bases and at United States ports, similar to the USS Cole operation. Al-Faq'asi suggested an operation similar to the 9/11 bombings, but which would originate in planes departing from Britain or Australia for Canada in order to circumvent the requirements of a United States visa to enter the country, and plans

to assassinate President Bush. With regard to the presidential assassination, Abu Ali suggested two possibilities: an assassination plot involving at least three snipers to fire upon the President while in public or a martyr operation conducted while the President was out greeting the public.

In the course of these plans and discussions, Al-Faq'asi requested that Abu Ali move out of the dormitory where he lived and advised Abu Ali that a "suitable residence" would be found where he "could be trained on manufacturing explosives, information gathering, and forgery." Abu Ali went with al-Faq'asi to live in a villa in the al-Iskan neighborhood in Medina for training. Using the name "Ashraf," Abu Ali was trained by a man called "Ahmad" on how to assemble and disassemble the Kalashnikov machine gun, five of which were located in the villa along with ammunition. Abu Ali informed Ahmad that he was tasked with killing the United States President. Abu Ali also spoke on at least one occasion to Sheikh Nasser, a/k/a Ali al-Khudair, who "gave his blessing for the assassination of the President of the United States."

In addition to training, the al-Faq'asi Medina cell provided Abu Ali with finances and equipment. He was given money to buy a laptop computer, a cell phone, and books, as well as written materials on security and methods of concealment. He was also given a USB memory chip that included a clip taken during the bombing of Afghanistan which contained the voices of American pilots, and tasked with translating the recording into Arabic.

On May 6, 2003, Saudi authorities discovered a large stash of weapons and explosives in Riyadh, Saudi Arabia, which was suspected to be intended for use in terrorist activities within that country. The following day, the Saudi government published a list of the 19 most wanted individuals in connection with terrorist activity. The list included al-Faq'asi and Sultan Jubran. According to Abu Ali, after the list was published, al-Faq'asi told him that the villa location would be changed and Abu Ali was taken to a farm where he stayed for several days.

Six days later, on May 12, 2003, al-Qaeda carried out a number of suicide bombings in Riyadh, killing approximately 34 people includ-

ing 9 Americans. That night, Abu Ali and the other cell members performed guard duty at the cell's safehouses. After the bombings, Abu Ali and a number of the others moved to a second villa in an al-Iskan neighborhood where they stayed for three days, although Abu Ali did not spend the night in the villa with the others. According to Abu Ali, the villa contained "a dimly-lit room that contained wires and cell phones, . . . machine guns, ammunition, a pistol and a hand grenade." Later, the group moved back to the farm, where Abu Ali continued his training in explosives and forgery. He received lessons from Majid (Mohammad Salem al-Ghamdi) on forging and removing seals, altering photos, and removing visas, and received lessons from al-Faq'asi on explosives, making explosives, and compounds. Another man, Umar al-Hakmi, provided lessons on fuses and wiring.

On May 26 and 27, 2003, authorities with the Saudi Mabahith received orders to raid several suspected terrorist safe houses in Medina, including the safe house in the Al-Azhari villa where Abu Ali had received training.[2] Among the evidence retrieved during the search of one safe house was an English translation of an American pilot's radio transmission and a paper with Abu Ali's additional alias names of "Hani" and "Hanimohawk" written on it. The authorities also recovered a number of automatic rifles and guns, ammunition, fertilizer, hand grenades, cell phones which were being converted to explosives, as well as computers, cameras, walkie-talkies, and laminating equipment for identification cards. A number of members of the al-Faq'asi terrorist cell were arrested during the raids, including al-Ghamdi, who had trained Abu Ali, and Sheikh Nasser, who had given Abu Ali the blessing for the presidential assassination. Al-Faq'asi and Sultan Jubran, disguised in women's clothing, escaped.[3]

During subsequent questioning by the Saudi authorities, al-Ghamdi informed the Mabahith that one of their members was a student at the University of Medina of either American or European background who went by the alias "Reda" or "Ashraf." Further investigative

---

[2]The Saudi Mabahith is part of the Saudi Ministry of Interior. Its mission is to fight terrorism.

[3]Al-Faq'asi surrendered to Saudi authorities in June 2003. Sultan Jubran was killed in a shootout with Saudi authorities in September 2003.

efforts resulted in the photo identification of Abu Ali as the American or European member of the cell.

On June 8, 2003, Abu Ali was arrested by the Mabahith at the Islamic University in Medina and his dormitory room was searched. Among the items found there were a GPS device, jihad literature, a walkie talkie, a United States passport, a Jordanian passport and identification card, a Nokia cellular telephone, a telephone notebook containing al-Qahtani's name, and literature on jihad. Abu Ali was then flown from Medina to Riyadh, where he was interrogated by the Mabahith. Although he initially denied involvement with the al-Faq'asi cell, he confessed when the Mabahith officers addressed him with his alias names of "Reda" and "Ashraf." Specifically, Abu Ali confessed to his affiliation with al-Qaeda and, in particular, the Medina cell headed by al-Faq'asi. According to Abu Ali, he joined the al-Qaeda cell "to prepare and train for an operation inside the [United States]," including an "intention to prepare and train to kill the [United States] President." In addition to written confessions, the Mabahith obtained a videotaped confession in which Abu Ali admitted his affiliation with the Medina cell and its plans to conduct terrorist operations within the United States, including the plan to assassinate President Bush and to destroy airliners destined to this country.

Following Abu Ali's arrest by the Saudi authorities, the FBI was notified of his suspected involvement in the al-Qaeda cell in Saudi Arabia and advised that the cell was planning on conducting terrorism operations in the United States. Although the FBI requested access to Abu Ali, the Mabahith denied the request. On June 15, 2003, the Mabahith allowed the FBI to supply proposed questions, but later rejected the list and the breadth of the inquiry sought. Ultimately, the Mabahith only agreed to ask Abu Ali six of those questions and to allow the FBI officers to observe his responses through a one-way mirror. Abu Ali was asked whether he was tasked to assassinate the President (as had been reported by the Mabahith to the FBI), when he arrived in Saudi Arabia, whether he knew of any planned terrorist attacks against American, Saudi, or Western interests, whether he was recruited by any terrorist organization, whether he had used false passports, and the nature of his father's position in the Embassy.

Other than consular contact, the United States was denied all access to Abu Ali until September of 2003.

In the meantime, on June 16, 2003, the FBI obtained and executed a search warrant at Abu Ali's home in Virginia. Among the items found there, the agents discovered a printout of the buddy list of email addresses from MSN Hotmail account Ahmedabuali@hotmail.com, which contained an address of abumuslim99@hotmail.com for al-Qahtani, an address book containing the name of al-Qahtani, a two-page article praising the 9/11 attacks in this country, a handguns magazine addressed to Abu Ali which contained a feature article on methods for the concealed carrying of handguns, and an email message from an unknown individual to Abu Ali discussing opportunities for Muslim fighters in the conflict between Muslim rebels and Russians in Chechnya.

## B.

On February 3, 2005, a federal grand jury returned an indictment against Abu Ali. The Saudi officials surrendered Abu Ali to United States authorities and he was flown back to the United States on February 21, 2005. He had his initial appearance before the United States magistrate judge the following day. In the superseding indictment, Abu Ali was charged with the following offenses: Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization (al-Qaeda), in violation of 18 U.S.C.A. § 2339B (Count 1); Providing Material Support and Resources to a Designated Foreign Terrorist Organization (al-Qaeda), in violation of 18 U.S.C.A. § 2339B (Count 2); Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C.A. § 2339A (Count 3); Providing Material Support to Terrorists, in violation of 18 U.S.C.A. § 2339A (Count 4); Contribution of Services to al-Qaeda, in violation of 50 U.S.C.A. § 1705(b), 31 C.F.R. § 595.204 (Count 5); Receipt of Funds and Services from al-Qaeda, 50 U.S.C.A. § 1705(b), 31 C.F.R. § 595.204 (Count 6); Conspiracy to Assassinate the President of the United States, 18 U.S.C. § 1751 (Count 7); Conspiracy to Commit Aircraft Piracy, 49 U.S.C.A. § 46502(a)(2) (Count 8); and Conspiracy to Destroy Aircraft, 18 U.S.C.A. § 32(b)(4) (Count 9).

In March 2005, the government filed a motion pursuant to Rule 15 of the Federal Rules of Criminal Procedure requesting an order allow-

ing it to conduct depositions of the Saudi Arabian witnesses in Saudi Arabia. Over Abu Ali's objection, these depositions were taken in July 2005.

On October 25, 2005, the district court rejected Abu Ali's subsequent attempts to prohibit admission of the deposition testimony at trial, as well as his effort to suppress the introduction of his various statements and confession made to the Saudi Mabahith, *see United States v. Abu Ali*, 395 F. Supp. 2d 338 (E.D. Va. 2005), and trial commenced before the jury on October 31, 2005.

On November 22, 2005, Abu Ali was convicted of all charges. He was subsequently sentenced to 360 months imprisonment to be followed by a term of 360 months of supervised release. Abu Ali appeals his convictions and his sentence on a number of grounds and the government cross-appeals the sentence.

## II.

It is undisputed that during Abu Ali's time in Saudi custody, he was repeatedly interrogated, but never given either a probable cause determination or *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436 (1966). It is also undisputed that the district court admitted into evidence at trial inculpatory statements and confessions elicited during this custodial interrogation. Abu Ali contends that the court erred in permitting the jury to consider these statements and confessions, because (1) he was never brought before a judicial officer for a probable cause determination, (2) he was never given *Miranda* warnings, and (3) his statements were allegedly involuntary. We address each purported basis for exclusion in turn.

## A.

Abu Ali first contends that following his arrest in Saudi Arabia on June 8, 2003, he had a Fourth Amendment and statutory right to prompt presentment before a neutral judicial officer, such as a United States federal magistrate, to determine that probable cause supported his detention. *See Gerstein v. Pugh*, 420 U.S. 103, 125 (1975); 18 U.S.C. § 3501(c) (2000); Fed. R. Crim. P. 5(a)(1)(B); *see also County*

*of Riverside v. McLaughlin*, 500 U.S. 44, 52-53 (1991). He contends that because he was not afforded this right, all evidence obtained during his time in Saudi custody was inadmissible as "fruit" of the prompt presentment violation.

Of course, any prompt presentment guarantee applies only to actions undertaken by domestic authorities. Abu Ali thus rests his prompt presentment claim on the assertion that his arrest and detention by Saudi authorities, beginning on June 8, 2003, resulted from an "illicit working arrangement" between Saudi and United States law enforcement and so his right to prompt presentment attached at the time of that collaboration. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 359-60 (1994) (noting that "improper collaboration" between federal and state officers undertaken to delay federal presentment leads to suppression in federal court of any resultant confession); *Anderson v. United States*, 318 U.S. 350, 356 (1943) (excluding fruits of these impermissible "working arrangement[s]").[4] The district court thoroughly considered and rejected Abu Ali's factual assertion that there was such a "working arrangement" between Saudi and United States law enforcement.

After hearing two weeks of testimony, the district court found that "[t]he evidence clearly demonstrates that the Saudi government arrested the defendant on June 8, 2003, in Saudi Arabia based on its own information and interest in interrogating the defendant as a suspected member of the al-Faq'asi terrorist cell located in Medina, Saudi Arabia." *Abu Ali*, 395 F. Supp. 2d at 381-82 . The court further found that Saudi officials did not engage in improper collaboration with the United States in effecting Abu Ali's arrest.

---

[4]The sole, prompt presentment argument offered by, or available to, Abu Ali challenges his treatment while in Saudi custody. He received a probable cause determination — in the form of a federal indictment — before he was taken into United States custody on February 21, 2005. An individual arrested following the return of a proper indictment has no "prompt presentment" right. *See Gerstein*, 420 U.S. at 114 (limiting the right to prompt presentment to cases of warrantless arrest); *see also id.* at 117 n.19 ("[A]n indictment . . . conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry.").

Abu Ali does not appear to dispute the district court's factual finding that the United States did not participate in his arrest in Medina. Nor does he point to any evidence that calls into question the district court's finding that, in the wake of the May 12, 2003 bombings in Riyadh, the Saudi government had an independent interest in, and in fact acted independently in, detaining him. Moreover, although he disputes the district court's finding that he was held "pursuant to a Saudi government order," *Abu Ali*, 395 F. Supp. 2d at 382, he offered no credible evidence that the Saudis held, or continued to hold, him so that United States officials could evade their constitutional duties. Accordingly, we can hardly conclude that the district court clearly erred in finding that there was no "improper collaboration" between United States and Saudi law enforcement. Because United States law enforcement did not collaborate in Abu Ali's arrest or detention, we must reject Abu Ali's prompt presentment claim.

## B.

## 1.

We next consider Abu Ali's *Miranda* challenge. Generally, statements made by a defendant held in United States custody and questioned by law enforcement officers without receiving *Miranda* warnings are inadmissible at trial in this country. *See New York v. Quarles*, 467 U.S. 649, 654 (1984). But because the United States cannot dictate the protections provided to criminal suspects by foreign nations and one of the principal purposes of the exclusionary rule — deterrence of unlawful police activity — is absent when foreign agents direct an interrogation, a different rule applies to statements elicited by foreign officials. *See United States v. Martindale*, 790 F.2d 1129, 1132 (4th Cir. 1986) ("[T]he exclusionary rule has little or no effect upon the conduct of foreign police."). Thus, voluntary statements obtained from a defendant by foreign law enforcement officers, even without *Miranda* warnings, generally are admissible. *See United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973).

Notwithstanding this distinction, United States law enforcement officials may not intentionally evade the requirements of *Miranda* by purposefully delegating interrogation duties to foreign law enforce-

ment officers and then having the fruits of the interrogation admitted at trial in the United States. *See, e.g.*, *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992); *cf. Anderson*, 318 U.S. at 356 ("There was a working arrangement between the federal officers and [a local sheriff] . . . [t]herefore, the fact that the federal officers themselves were not formally guilty of illegal conduct does not affect the admissibility of the evidence which they secured improperly through collaboration with state officers."). For this reason, two exceptions have developed to the general rule that voluntary statements obtained by foreign officials during a custodial interrogation without benefit of *Miranda* warnings are admissible. Namely, such statements will not be admissible if obtained by foreign officials (1) engaged in a joint venture with, or (2) acting as agents of, United States law enforcement officers. *See, e.g.*, *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980); *see also Maturo*, 982 F.2d at 61.

Abu Ali contends that his answers to an interrogation on June 15, 2003 should not have been admitted into evidence because that interrogation constituted a "joint venture" between his Saudi interrogators and United States law enforcement officers, and his Saudi interrogators acted as the agents of United States law enforcement on that day, posing questions prepared by the FBI and asked at its behest. The district court considered and rejected both claims in denying Abu Ali's pre-trial motion to suppress, holding admissible all of his statements to the Mabahith.

Abu Ali does not dispute the court's factual finding that the United States was not involved in his interrogation prior to June 15th, or in his handwritten confession or the July 24th videotaped reading of that confession and that, therefore, United States officials had no duty to ensure that he received *Miranda* warnings on those occasions. Thus, he only challenges the failure to provide *Miranda* warnings with respect to the statements taken on June 15, 2003, and argues that the June 15th violation tainted his later statements.

2.

As mentioned earlier, prior to its June 15th interrogation of Abu Ali, the Saudi Mabahith allowed United States law enforcement officers to propose questions to be asked of the defendant. The FBI sup-

plied a list of questions, and, on June 15th, the Mabahith asked Abu Ali six of the questions submitted. However, the Saudis rejected a majority of the questions proposed by the FBI, and asked a number of their own questions during the interrogation. Furthermore, although no FBI or other United States agents were present in the interrogation room on June 15th or had any direct contact with Abu Ali, FBI and Secret Service agents did observe Abu Ali and his interrogator through a one-way mirror during the questioning, and a Saudi official consulted with the observing United States agents at the end of the interview. After properly recounting these facts, the district court concluded that they did not constitute a "joint venture" between Saudi interrogators and United States law enforcement officers.

The "joint venture" doctrine provides that "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities." *Yousef*, 327 F.3d at 145; *see also Heller*, 625 F.2d at 599 ("[I]f American officials participated in the foreign search or interrogation . . . the exclusionary rule should be invoked."); *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980) ("Under the joint venture doctrine, evidence obtained through activities of foreign officials, in which federal agents substantially participated and which violated the accused's Fifth Amendment or *Miranda* rights, must be suppressed in a subsequent trial in the United States.").

Only a few cases illuminate what constitutes "active" or "substantial" participation. *See Yousef*, 327 F.3d at 144-46 (finding no active participation when there was no evidence that the United States had "encouraged, requested, or participated in [suspect's] interrogation or written statement" and United States agents did not receive any statement from foreign authorities until after suspect was in United States custody); *Heller*, 625 F.2d at 599-600 & n.7 (finding no joint venture when American law enforcement was only "peripheral[ly]" involved in suspect's arrest, *Mirandized* the suspect when questioning him, and did not exchange information with British authorities regarding separate un-*Mirandized* interrogation of suspect by the British); *Pfeifer*, 615 F.2d at 877 (finding no substantial participation when an American Drug Enforcement Agency (D.E.A.) agent was present during

interrogation, but there was no evidence that the agent instigated any questioning or took any part in it); *United States v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978) (finding substantial participation when American D.E.A. agents contacted Mexican officials about suspected drug activity, coordinated the relevant surveillance, supplied personnel in the sting operation, signaled appropriate time to arrest suspects, and were present at suspect's interrogation); *United States v. Trenary*, 473 F.2d 680, 682 (9th Cir. 1973) (finding no joint venture when American customs officer, who never identified himself as an American agent, translated questions asked by Mexican police officers).

Although few in number, these cases do permit us to derive one general rule: mere presence at an interrogation does not constitute the "active" or "substantial" participation necessary for a "joint venture," *see Pfeifer*, 615 F.2d at 877, but coordination and direction of an investigation or interrogation does, *see Emery*, 591 F.2d at 1268; *see also Pfeifer*, 615 F.2d at 877 & n.3 (implying that had U.S. officials participated in the suspect's questioning the court might face a different case). A majority of the court would affirm the district court's holding that the June 15th interrogation was not a joint venture and so there was no *Miranda* violation.[5] One judge believes that the June

(Text continued on page 17)

[5]Judge Wilkinson and Judge Traxler would affirm the district court and hold that the June 15th interrogation of Abu Ali was not a joint venture. The joint venture doctrine prohibits American law enforcement officers from circumventing the constitutional protections afforded criminal suspects who are interrogated by foreign officials when the United States possesses a significant degree of investigative control or authority. This purpose underlies, and informs, the "active" or "substantial" participation standard typically utilized in joint venture determinations. *See, e.g.*, *Emery*, 591 F.2d at 1267-68 (finding the arrest and interrogation of a suspect in Mexico to be a joint venture because American officials "alerted the Mexican police of the possible activity, coordinated the surveillance," participated in the sting operation, "gave the signal that instigated the arrest," and were present at the interrogation); *United States v. Mundt*, 508 F.2d 904, 906-907 (10th Cir. 1974) (finding the arrest and interrogation of a suspect in Peru not to be a joint venture, even though an American official "helped plan the operation" that led to the arrest, because "the Peruvian Police [were] in ultimate control" once the arrest was made).

The district court, after considering nearly fourteen days of testimony, found that the June 15 interrogation did not constitute a joint venture because the United States, lacking any investigative control or authority, did not "actively" or "substantially" participate. We affirm this finding.

To begin, the United States played no role in the arrest or detention of Abu Ali, and the "Saudi government was in complete control of Mr. Abu Ali while in custody." *Abu Ali*, 395 F. Supp. 2d at 381-82. Likewise, "the Saudi government controlled every aspect of the questioning of Mr. Abu Ali on June 15, 2003." *Id.* at 382. For instance, the Saudi government refused to accommodate a request by the United States to directly question Abu Ali, instead only permitting American officials to observe the interrogation through a one-way mirror. Although the Saudis did allow the United States to submit questions for consideration, at no point did the Saudi government relinquish any part of its control over the interrogation: the Mabahith "determined what questions would be asked, determined the form of the questions, and set the length of the interrogation." *Id.* In fact, the Saudi interrogators refused to ask a majority of the questions submitted by the United States, and asked a number of their own questions during the interrogation.

In sum, the Saudis were always in control of the investigation. It is clear to us, as it was to the district court, that the Mabahith never acted as a mouthpiece or mere conduit for their American counterparts. Based on these findings, we are convinced, as was the district court, that American law enforcement officials were not trying to "evade the strictures of *Miranda*," *Martindale*, 790 F.2d at 1131-32, and the June 15 interrogation did not rise to the level of a joint venture. *Abu Ali*, 395 F. Supp. 2d at 381-83.

A determination that the suggestion of questions, without more, constitutes a joint venture would be problematic for at least two reasons. First, such a broad holding would contravene the well-established notion that *Miranda*, which is intended to regulate only the conduct of *American* law enforcement officers, does not apply extraterritorially to foreign officials absent significant involvement by American law enforcement. *See Martindale*, 790 F.2d at 1331-32 (quoting *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971)); *see also, e.g.*, *Yousef*, 327 F.3d at 145; *United States v. Covington*, 783 F.2d 1052, 1056 (9th Cir. 1985); *United States v. Nolan*, 551 F.2d 266, 273 (10th Cir. 1977); *Kilday* , 481 F.2d at 656. Second, such a broad per se holding could potentially discourage

15th interrogation was a joint venture in which United States law enforcement officials violated Abu Ali's *Miranda* rights.[6]

___

the United States and its allies from cooperating in criminal investigations of an international scope. Both the United States and foreign governments may be hesitant to engage in many forms of interaction if the mere submission of questions by a United States law enforcement officer were to trigger full *Miranda* protections for a suspect in a foreign country's custody and control. To impose all of the particulars of American criminal process upon foreign law enforcement agents goes too far in the direction of dictation, with all its attendant resentments and hostilities. Such an unwarranted hindrance to international cooperation would be especially troublesome in the global fight against terrorism, of which the present case is clearly a part.

Because for the reasons noted above, the Saudis were in control of the interrogation, they likewise were not acting as agents of the United States. We therefore also would affirm the district court's finding "that Saudi officials did not act as 'agents' of the United States in the arrest, detention, or interrogation of [Abu Ali]." *Abu Ali*, 395 F. Supp. 2d at 383.

Of course, the matter is one of degree, and American courts must impose proper safeguards on the admission of evidence in their own proceedings. None of our discussion suggests for a moment that courts relax their insistence that confessions must be voluntary and reliable. Regardless of whether there is a joint venture, the voluntariness standard, which serves as the ultimate safeguard against coerced confessions, applies to all interrogations and governs the admissibility of the statements at issue here.

[6]Judge Motz would hold that the June 15th interrogation was a joint venture. In contending to the contrary, the government notes that the United States agents never questioned Abu Ali face-to-face, that the Saudi agents did not accept all of the questions proffered by United States agents, and that the Saudi agents also asked questions of their own. However, the government posits no *legal* reason that these facts remove this encounter from the realm of "active" or "substantial" participation. Moreover, neither the government nor the majority offers any case, from any court, that presents a situation analogous to the one at issue here — that is, a case in which foreign officers, at the request of the United States, posed questions that United States officials had drafted, and then allowed United States officials to watch the interrogation.

### 3.

Even if the district court erred in refusing to suppress statements made during the June 15th interrogation, we all agree that this error was harmless.

Like any other evidentiary ruling, we subject the district court's error in admitting the statement to harmless error review. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Evidence erroneously admitted will be deemed harmless if a reviewing court is able

---

Whatever else "active" or "substantial" participation may mean, when United States law enforcement officials propose the questions propounded by foreign law enforcement officials, and those questions are asked in the presence of, and in consultation with United States law enforcement officials, this must constitute "active" or "substantial" participation. *Accord United States v. Bin Laden*, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001) ("Whatever the precise formulation, the existence of the ["joint venture"] exception itself is based on the assumption that *Miranda* must apply to any portion of an overseas interrogation that is, in fact or form, conducted by U.S. law enforcement.") (dicta). After all, the purpose of an interrogation is to obtain answers to questions about criminal or otherwise dangerous activity. Drafting the questions posed to a suspect thus constitutes the quintessential participation in an interrogation. It differs in kind from observation of an interrogation, or rote translation of an interrogator's questions and a suspect's responses. Observers and translators undoubtedly gain important information from a suspect's answers as well as from his behavior and demeanor, but those who formulate the questions asked during an interrogation actually direct the underlying investigation.

To hold otherwise permits United States law enforcement officers to strip United States citizens abroad of their constitutional rights simply by having foreign law enforcement officers ask the questions. This cannot be the law. Rather, when United States law enforcement officers provide the questions to be asked of a suspect by cooperating foreign law enforcement officials, they clearly have engaged in "active" or "substantial" participation such that any resultant interrogation becomes a joint venture. Consequently, when the suspect has not been given *Miranda* warnings, the responses to that interrogation should be suppressed.

to "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997). Here, we are able to say, with fair assurance, that the jury's judgment was not substantially swayed by the admission of Abu Ali's answers to the June 15th questioning.

This is so because, as the district court properly recognized, Abu Ali had confessed to *each* of the crimes of which he was convicted before the June 15th interrogation took place. As a result, Abu Ali's answers to the questions submitted by the FBI on June 15th were cumulative. *See United States v. Seidman*, 156 F.3d 542, 558 (4th Cir. 1998) ("'Improper admission of evidence which is cumulative of matters shown by admissible evidence is harmless error.'" (*quoting Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 132 (8th Cir. 1985)). We are thus confident that the admission of Abu Ali's responses to the June 15th questions did not substantially sway the jury verdict. Therefore, any error in admitting these statements was harmless.

## C.

Abu Ali next claims that all of his statements and confessions while in Saudi custody should have been suppressed as involuntary. The district court rejected this argument, finding that the government had "demonstrated by a 'preponderance of the evidence' that any incriminating statements" made by Abu Ali while in Saudi custody in June and July, 2003, were "voluntary" and so admissible at trial.[7] *Abu Ali*, 395 F. Supp. 2d at 342.

When *Miranda* warnings are unnecessary, as in the case of an interrogation by foreign officials, we assess the voluntariness of a defendant's statements by asking whether the confession is "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). If it is, "it may

---

[7]Abu Ali also presented his evidence and contentions as to the voluntariness of his confessions to the jury, which could draw its own conclusions. Since the jury found Abu Ali guilty on all charges, it presumably also rejected any claim that his statements were involuntarily given.

be used against him." *Id.* at 602. But, if the defendant's "will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.*; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). The government acknowledges that "[t]he crucial inquiry is whether [Abu Ali's] will has been 'overborne,'" and maintains that it was not; Abu Ali, of course, contends that it was.

In evaluating whether a defendant's will has been overborne, courts must assess the totality of the circumstances, taking into account characteristics of the accused, and details of the interrogation. *See Schneckloth*, 412 U.S. at 226. The factors we consider include: "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* (internal citations omitted). We review a trial court's legal conclusion as to the voluntariness of an accused's statements *de novo*, *United States v. Dodier*, 630 F.2d 232, 236 (4th Cir. 1980), but its "findings of fact on the circumstances surrounding the confession" for clear error, *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (internal quotation marks omitted). We particularly defer to a district court's credibility determinations, for "it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995).

In this case, after hearing nearly fourteen days of testimony, the court issued a 113-page opinion describing and analyzing the testimony of over 20 witnesses, including Abu Ali, his Saudi captors, FBI agents, and American consular officials who met with Abu Ali during his detention in Saudi Arabia, as well as psychiatrists, other doctors, and nurses. The court evaluated the demeanor and testimony of these witnesses, and then made extensive findings of fact as to the credibility of the witnesses, including Abu Ali, and the conditions of Abu Ali's confinement and interrogation. We need only briefly summarize these factual findings here.

Initially, the court properly recognized that "torture, and evidence obtained thereby, have no place in the American system of justice."

*Abu Ali*, 395 F. Supp. 2d at 380. But, based on its evaluations of "the credibility of the witnesses," and "the quality of the evidence presented," *id.* at 374, the district court found itself "left with lingering questions concerning the credibility of Mr. Abu Ali and his claim that he was tortured," *id.* at 378. The court credited the testimony of the Saudi Arresting Officer and the Lieutenant Colonel (the Warden at the Medina detention facility where Abu Ali was held for two days following his arrest) that no Saudi official used coercive interrogation techniques on Abu Ali. The court found that the Lieutenant Colonel's testimony that Abu Ali was never abused was believable while Abu Ali's contrary testimony "raise[d] questions that bear on the defendant's credibility." *Id.* at 373.

In addition, the court relied on the testimony of two other Saudi officials, the Brigadier General and the Captain, that the interrogation of Abu Ali in Riyadh "was conducted in the absence of threats or torture." *Id.* at 373. The court found "implausible" Abu Ali's "claim about having been whipped" during the early period of his detention because several Saudi and American witnesses who observed him during this period reported behavior "that do[es] not coincide with how a recently beaten person would behave." *Id.* at 374. Moreover, the court found that "[s]ome aspects" of Abu Ali's testimony "just do not flow logically," *id.* at 378, and observed that "during his testimony, there were times where Mr. Abu Ali seemed to deflect the question," *id.* Finally, the court considered, but found deficiencies in, the testimony of Abu Ali's medical experts who supported his torture claim, crediting instead the testimony of the government's experts that Abu Ali showed no physical or psychological signs of mistreatment.

The district court largely rested its legal conclusion that Abu Ali's statements were voluntary on its factual findings concerning his claims of torture and abuse. Our thorough review of the record provides no basis for finding clear error in any of those findings. This, however, does not end our inquiry. We must evaluate the voluntariness of Abu Ali's confessions *de novo*, looking to the totality of the circumstances to determine whether his will was "overborne." *See Schneckloth*, 412 U.S. at 225.

In making this evaluation, we consider that Abu Ali was not provided the legal protections — including prompt presentment and

*Miranda* warnings — that the Constitution requires be provided to suspects by United States law enforcement officers. Saudi Arabia is a sovereign nation with its own legal system, and the failure to provide Abu Ali these protections does not, in and of itself, require exclusion of the statements Abu Ali made in Saudi custody. At the same time, we do consider the absence of these protections as one factor in the totality of circumstances in evaluating whether Abu Ali made his statements voluntarily.

In making this voluntariness determination, we also look to the district court's factual findings as to Abu Ali's personal characteristics, and the conditions of his confinement. The court noted that Abu Ali "is an intelligent, well-educated man with a rich and graphic vocabulary," *Abu Ali*, 395 F. Supp. 2d at 376, and found him "intelligent, capable, and articulate," *id.* at 378. It is undisputed that Abu Ali attended school in Saudi Arabia, and he does not allege any religious, cultural, or linguistic difficulties in dealing with his Saudi interrogators. Indeed, he responded to his interrogators' questions in Arabic, and the district court found that the Saudi officers provided him with a prayer rug and Koran among other accommodations. For these reasons, Abu Ali's personal characteristics did not render him particularly susceptible to coercion or pressure.

In addition, the district court rejected Abu Ali's testimony that the Saudis subjected him to coercive conditions of confinement. Instead, the court found believable the testimony of Saudi officers that they confined Abu Ali under reasonable conditions, including provision of three meals a day, and a cell with a bed, blanket and pillow. The court further found believable Saudi testimony that Saudi authorities did not question Abu Ali during his initial detention in Medina, and noted that Abu Ali's own description of the Riyadh interrogation suggested that he was not questioned in Medina.

Saudi authorities did question Abu Ali after transporting him to Riyadh on June 10, 2003. But, the district court credited their testimony that "Abu Ali was granted breaks, access to food, water, a bathroom, and refreshments during breaks in questioning," and that they did not attempt to deprive him of sleep. The court further found believable testimony from Saudi authorities that during just the second session of questioning, on June 11th, Abu Ali "began his lengthy

and detailed confession." Abu Ali's extensive written responses to questions, beginning June 11, 2003 — his second day in Riyadh — support this finding. Although the questioning of Abu Ali lasted many days, that he began to confess in great detail on just the second day of interrogation indicates that his will was not overborne by prolonged questioning.

After consideration of all of the evidence and the extensive factual findings made by the district court, we conclude that Abu Ali's statements were voluntary. Abu Ali was intelligent, articulate, and comfortable with the language and culture of the country in which he was detained and questioned. The district court found, based upon copious record evidence, that he was not tortured, abused, threatened, held in cruel conditions, or subjected to coercive interrogations. On the basis of the totality of these circumstances, we conclude that Abu Ali's statements were "the product of an essentially free and unconstrained choice." *Culombe*, 367 U.S. at 602.

### III.

Even if we uphold (as we have) the district court's findings as to the presentment, *Miranda*, and voluntariness challenges to the admission of his multiple confessions, Abu Ali contends that the government failed to corroborate the confessions sufficiently.

### A.

Abu Ali poses this contention as a challenge to the sufficiency of the evidence used to corroborate his confessions. To prevail on any sufficiency challenge, a defendant must meet an exacting standard. In most cases, evidence adequately supports a conviction if, viewing it in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We therefore confine reversal of a conviction on grounds of insufficient evidence "to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17 (1978).

However, "[i]t is a settled principle of the administration of crimi-

nal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused" made after commission of a crime. *Wong Sun*, 371 U.S. at 488-89. This is so because "the doubt persists that the zeal of the agencies of prosecution to protect the peace . . . or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession." *Opper v. United States*, 348 U.S. 84, 89-90 (1954). Thus, courts require corroboration to prevent confessions to crimes never committed and "convictions based upon untrue confessions alone." *Warszower v. United States*, 312 U.S. 342, 347 (1941).[8] Still, the Supreme Court has cautioned that since this corroboration rule "infringe[s] on the province of the primary finder of facts, its application should be scrutinized lest the restrictions it imposes surpass the dangers which gave rise to them." *Smith v. United States*, 348 U.S. 147, 153 (1954).

At one time, courts and commentators disagreed as to the amount and quality of corroboration required. Some mandated that corroboration provide independent proof of the *corpus delicti*, or of commission of a crime; others followed a more flexible "trustworthiness" approach. In *Opper*, the Supreme Court resolved this question for federal courts by rejecting the *corpus delicti* rule and adopting the trustworthiness approach, which it found to be the "better rule." 348 U.S. at 93. Pursuant to this rule, the government must "introduce substan-

---

[8]Abu Ali also maintains that the district court erred when it failed to instruct the jury on the need for corroboration. Because he never requested such an instruction, we can reverse on this ground only if he meets the rigorous plain error standard. *See United States v. Olano*, 507 U.S. 725, 732 (1993) (holding that to demonstrate plain error a defendant must show plain error, that the error affected his substantial rights, and that failure to recognize the error would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings" (internal quotation marks omitted)). Abu Ali cannot begin to demonstrate plain error given that a number of our sister circuits have held that a court need not instruct juries on the corroboration rule, even if requested to do so. *See, e.g.*, *United States v. Howard*, 179 F.3d 539, 543 (7th Cir. 1999); *United States v. Dickerson*, 163 F.3d 639, 641-43 (D.C. Cir. 1999); *United States v. Singleterry*, 29 F.3d 733, 739 (1st Cir. 1994). Contrary to Abu Ali's argument, *United States v. Booker*, 543 U.S. 220 (2005), does not in any way undermine these holdings.

tial independent evidence which would tend to establish the trustworthiness of the [defendant's] statement." *Id.* But this "corroborative evidence need not be sufficient, independent of the [defendant's incriminatory] statements, to establish the *corpus delicti*." *Id.*; *see also Wong Sun*, 371 U.S. at 489 (noting "extrinsic proof [i]s sufficient which merely fortifies the truth of the confession, without independently establishing the crime charged" (internal quotation marks omitted)).

Independent evidence adequately corroborates a confession if it "supports the essential facts admitted sufficiently to justify a jury inference of their truth;" the facts admitted "plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt." *Opper*, 348 U.S. at 93. Thus, "corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that [the] defendant is guilty." *Smith*, 348 U.S. at 156. The government must establish each element of an offense but may do so "by independent evidence *or* corroborated admissions," and one "mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense through the statements of the accused." *Id.* (emphasis added).

With these principles in mind, we consider the case at hand.

### B.

Undoubtedly, Abu Ali's own repeated confessions provide the strongest evidence of his guilt. Orally and in writing on several occasions, he confessed that he joined an al-Qaeda cell in Saudi Arabia and plotted with Sultan Jubran, al-Faq'asi, and others to engage in jihad and commit terrorist acts against the United States, including assassinating the President and other officials, hijacking and blowing up American warplanes, and striking nuclear stations. To further these plans, Abu Ali related that he moved from his university dormitory to al-Qaeda safehouses, translated into Arabic a video clip of American pilots attacking Afghanistan, received training in weapons, explosives, forgery, and intelligence gathering, and researched on the

internet nuclear facilities and airline flights. He described weapons and explosives stored at the safehouses and he admitted that al-Faq'asi gave him money to buy a laptop computer, cellphone, books, and written materials on security and concealment to further terrorist activities.[9]

Without testimony from Abu Ali's co-conspirators, the government relied largely on circumstantial evidence to corroborate Abu Ali's confessions. The Supreme Court has long recognized that circumstantial evidence can provide the basis for criminal convictions. *See Holland v. United States*, 348 U.S. 121, 137-38 (1954). Similarly, courts have held that a confession may be corroborated by circumstantial evidence. *See United States v. Chimal*, 976 F.2d 608, 611 (10th Cir. 1992); *United States v. Grizales*, 859 F.2d 442, 446 (7th Cir. 1988); *United States v. Baker*, 293 F.2d 613, 616-17 (3d Cir. 1961).

The government offered significant independent circumstantial evidence tending to establish the trustworthiness of Abu Ali's confessions. For example, the government offered evidence recovered by Saudi authorities at the al-Qaeda safehouses, including a translation from English to Arabic of a conversation between American pilots, documents containing two of Abu Ali's aliases (Hani and Hanimohawk), and photographs of the various weapons, explosives, cell phones, computers, and walkie-talkies found in the safehouse, all of which Abu Ali had described. Jihad literature and address books containing the names and e-mail address of an al-Qaeda leader, a GPS device, a walkie-talkie, a handgun magazine, a cellphone, and other items found in Abu Ali's dormitory room in Medina or in his Falls

---

[9]Abu Ali's confessions contain remarkable detail, but we reject the government's suggestion that this detail might suffice to confirm their trustworthiness. The Supreme Court permits no exception to the rule that corroboration evidence must be independent when an "admission is made after the fact to an official charged with investigating the possibility of wrongdoing and the statement embraces an element vital to the Government's case." *Smith*, 348 U.S. at 155. Similarly, we do not rely on Abu Ali's numerous confessions to corroborate each other. *See United States v. Calderon*, 348 U.S. 160, 165 (1954) (noting a later admission "standing uncorroborated cannot serve to corroborate [defendant's] other admissions").

Church home similarly tended to establish the trustworthiness of his admissions that he had long wanted to join al-Qaeda, to further its goals, and to provide it support and assistance. The government also offered evidence that an al-Qaeda cell member identified Abu Ali as a member of the cell.

Perhaps the strongest independent evidence corroborating Abu Ali's confessions were two coded communications: one from him to Sultan Jubran occurring a day after the arrest of other cell members and the other from Sultan Jubran to him several days later. Abu Ali communicated that he had "heard the news about the children's sickness," wished them "a speedy recovery," and offered "[g]reetings to the group." Sultan Jubran responded that he had been "saved from the accident" but had "no idea about the others," and cautioned Abu Ali to prepare himself for a "medical checkup . . . soon." The government argued and the jury could infer that these communications constituted messages between al-Qaeda conspirators — Abu Ali bemoaning the capture of some of his fellow al-Qaeda members and wishing others well, and Sultan Jubran reporting that he had escaped capture and warning Abu Ali that he might face arrest "soon."

This independent evidence renders the case at hand very different from the three cases on which Abu Ali heavily relies. *See United States v. Stephens*, 482 F.3d 669 (4th Cir. 2007); *United States v. Bryce*, 208 F.3d 346 (2d Cir. 2000); *United States v. Fearn*, 589 F.2d 1316 (7th Cir. 1978). In each of those cases the courts reversed convictions because the defendant's confessions or admissions constituted the *only* evidence linking him to criminal conduct. *See Stephens*, 482 F.3d at 672 (noting the government presented "no evidence other than [defendant's] statement to establish his connection to a drug conspiracy or any drug trafficking crime"); *Bryce*, 208 F.3d at 356 (noting the "absence of corroboration by independent evidence"); *Fearn*, 589 F.2d at 1326 (holding that "[t]here was no substantial, or even slight evidence, other than the admission . . . which tended to show that the defendant was guilty beyond a reasonable doubt").

Abu Ali's argument that, despite the substantial independent evidence outlined above, the government did not provide adequate corroboration for his confessions, largely rests on a misunderstanding of the role of corroborative evidence. He asserts that the corroborative

evidence here is inadequate because it "failed to introduce evidence that *established* the 'essential facts admitted [by Abu Ali] sufficiently to justify a jury inference of their truth.'" (quoting *Opper*, 348 U.S. at 93) (alteration in original) (emphasis added). Abu Ali quotes *Opper* accurately, but out of context. In fact, the *Opper* Court instructed that "[i]t is sufficient if the corroboration *supports*" — not establishes — "the essential facts admitted," and that corroboration need only "*tend to* establish" — not establish — "the trustworthiness" of the confession. 348 U.S. at 93 (emphasis added). The evidence offered by the government meets this standard.

To be sure, the independent evidence does not *prove* Abu Ali's guilt of any crime, but this is not necessary. In his own statements, Abu Ali confessed to committing each of the crimes charged.[10] "[E]xtrinsic proof [i]s sufficient which merely fortifies the truth of the confession[s], without independently establishing the crime charged." *Wong Sun*, 371 U.S. at 489 (*quoting Smith*, 348 U.S. at 156). The independent evidence offered by the government did just that. This independent evidence, including the translation, documents, and books found in the Saudi safehouses and in Abu Ali's Saudi dorm room and Virginia home, "tend[s] to establish the trustworthiness" of his confession that he intended to and did contribute services to al-Qaeda, receive funds from al-Qaeda, and provide material support to terrorists and a designated foreign terrorist group, i.e. al-Qaeda, and thus supports the jury's conviction of him for these four substantive offenses.

---

[10]For this reason, Abu Ali's alternative contention — that *no* evidence establishes his guilt of conspiracy to assassinate the President, conspiracy to provide material support to terrorists, or providing material support to terrorists — fails. Considered in the light most favorable to the government, his confessions provide substantial evidence that he conspired to and did provide material support to terrorists. As to the charge of conspiracy to assassinate the President, Abu Ali maintains that the evidence against him on this charge only constitutes "ideation" and not conduct. Actually, the government offered evidence that Abu Ali confessed that he had long been determined to kill the President, discussed with al-Faq'asi particular ways to carry out the assassination, and engaged in explosive and intelligence training to carry out the assassination — suggesting that the conspiracy to assassinate the President constituted much more than Abu Ali's "ideation" at the time of his confession.

The remaining five convictions involved conspiracy with other members of al-Qaeda — including Sultan Jubran — to assassinate the President, commit air piracy, destroy aircraft, and provide material support to terrorists and to a designated foreign terrorist organization. Agreement between conspirators often presents difficult proof problems for the government. *See Iannelli v. United States*, 470 U.S. 770, 778 n.10 (1975); *Scales v. United States*, 367 U.S. 203, 226 n.18 (1961); *see also United States v. Burgos*, 94 F.3d 849, 857-58 (4th Cir. 1996). Here, however, the government's independent evidence — the coded communications between Abu Ali and Sultan Jubran — supported Abu Ali's account of a conspiracy among al-Qaeda cell members "sufficiently to justify a jury inference" as to the truth of that account. *Opper*, 348 U.S. at 93.

In sum, we believe the government presented sufficient independent evidence to "fortif[y]" the truth of Abu Ali's confessions, *Wong Sun*, 371 U.S. at 489, and to "tend to establish" their "trustworthiness," thus "justify[ing] a jury inference of their truth" beyond a reasonable doubt. *Opper*, 348 U.S. at 93.

IV.

We next address Abu Ali's claim that the taking of the depositions of the Saudi Mabahith officials in Riyadh violated his Sixth Amendment Confrontation Clause rights.[11] We hold that the procedures developed by the district court to meet the extraordinary circumstances of this case adequately protected Abu Ali's Sixth Amendment rights. We therefore reject his claim.

---

[11]Although Abu Ali raises no claim under Fed. R. Crim. P. 15, he does use the Rule to inform his Confrontation Clause argument. As to Rule 15, we note simply that many circuits have allowed into evidence Rule 15 depositions of foreign witnesses taken without the defendant present. *See United States v. Medjuck*, 156 F.3d 916, 920 (9th Cir. 1998); *United States v. McKeeve*, 131 F.3d 1, 8 (1st Cir. 1997); *United States v. Gifford*, 892 F.2d 263, 265 (3d Cir. 1989); *United States v. Salim*, 855 F.2d 944, 952 (2d Cir. 1988).

A.

We briefly summarize the facts relevant to his Confrontation Clause claim here. On June 8, 2003, the Mabahith arrested Abu Ali on suspicion that he was a member of the al-Faq'asi terrorist cell. Soon after his detention, Abu Ali confessed to his involvement with the cell when confronted with the fact that several other detained cell members had identified him. On July 18, 2003, while still in Saudi custody, Abu Ali wrote a handwritten confession which he was video-taped reading on July 24, 2003. The government offered both Abu Ali's handwritten and videotaped confessions as evidence at trial.

Abu Ali argued that he was tortured by the Mabahith and that his confessions were therefore involuntary. In depositions taken pursuant to Rule 15 of the Federal Rules of Criminal Procedure, Abu Ali's two principal interrogators both denied that they had ever tortured Abu Ali or were aware of any other Saudi government official engaging in such behavior. Transcripts of this testimony were made part of the record in the district court's hearing on Abu Ali's motion to suppress his confession and a videotape of the deposition (as redacted pursuant to the court's order) was played at trial and made part of the trial record.

B.

Abu Ali claims that his Sixth Amendment Confrontation Clause right was violated because he was not physically present when the Rule 15 depositions of the Mabahith officers were taken. Since the government planned to introduce the depositions at trial, Abu Ali claims that he should have been physically present when the Mabahith officers were deposed. This argument is premised on the well-accepted notion that "eye-to-eye" contact between the accused and his accuser is more likely to lead to the truth. *See Coy v. Iowa*, 487 U.S. 1012, 1019-20 (1988) ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'").

Abu Ali's absence at the Rule 15 deposition was the result of the logistical arrangements the trial court made to deal with the practical difficulties of securing testimony from the Mabahith officers. As Saudi citizens who reside in Saudi Arabia, the Mabahith officers were

beyond the subpoena power of the district court. Given this limitation, the United States government officially inquired into whether the Saudi Arabian government would allow the officers to testify at trial in the United States. The Saudi government denied this request, but permitted the officers to sit for depositions in Riyadh. As represented by counsel for the United States, this was a first in Saudi-American relations: the Saudi government had never before allowed such foreign access to a Mabahith officer.

Given the possibility of taking the deposition in Riyadh, the district court found it impractical for Abu Ali to travel to Saudi Arabia for two reasons. First, it would have been difficult for United States Marshals to maintain custody of Abu Ali while in Saudi Arabia. *See Medjuck*, 156 F.3d at 920 (noting that there was no mechanism in place for United States authorities to ensure the defendant's return in a "timely fashion" from a foreign deposition); *McKeeve*, 131 F.3d at 7 (noting that the United States lacks authority to keep a suspect in custody overseas); *Salim*, 855 F.2d at 947 (2d Cir. 1988) (same). Second, the fact that Abu Ali committed his offenses in Saudi Arabia might subject him to prosecution overseas, complicating — if not precluding — his return to the United States to face trial. *See Medjuck*, 156 F.3d at 920 n.2. In fact, the government represented at oral argument that Abu Ali never asked the district court to allow him to travel to Saudi Arabia for the depositions, and we find no evidence in the record to dispute this claim.

Given these practical difficulties — witnesses who could only testify in Saudi Arabia and a defendant unable to go to Saudi Arabia — the trial court attempted to fashion deposition procedures that would best preserve Abu Ali's Confrontation Clause right. At the court's directive, two defense attorneys, including Abu Ali's lead attorney, attended the depositions in Saudi Arabia, while a third attorney sat with Abu Ali in Virginia. Two attorneys for the government and a translator were also present in the room in Saudi Arabia while the Mabahith officers were being deposed.

A live, two-way video link was used to transmit the proceedings to a courtroom in Alexandria. This permitted Abu Ali and one of his attorneys to see and hear the testimony contemporaneously; it also allowed the Mabahith officers to see and hear Abu Ali as they testi-

fied. A court reporter in Alexandria transcribed the testimony in real time, and both the witnesses and Abu Ali were videotaped during the depositions, so that the jury could see their reactions. The trial court presided over the deposition testimony of the Mabahith officials from the courtroom in Alexandria, ruling on objections as they arose. Furthermore, Abu Ali was able to communicate via cell phone with his defense counsel in Saudi Arabia during the frequent breaks in the proceedings. In addition, the court was willing to stop the depositions if Abu Ali's counsel in Saudi Arabia wanted to consult with their client.

Having fashioned these procedures, the district court presided over seven days of deposition testimony from several Saudi Mabahith officers involved in the arrest, detention, and interrogation of Abu Ali. The subject matter of the depositions encompassed all aspects of Abu Ali's experience with the Saudi criminal justice system, including the manner of his arrest, the length of his interrogation, the conditions of his confinement, the Mabahith's methods of questioning, and the circumstances surrounding his confessions.

Of critical importance was the testimony of two Saudi government officials, a Brigadier General and a Captain in the Mabahith, who presided over the interrogation of Abu Ali. These officers stated that Abu Ali was not blindfolded, handcuffed, or shackled in any way during his interrogation, and that he was provided with food, water, and access to a bathroom during breaks in questioning. Both the Brigadier General and the Captain adamantly denied that they directed, participated in, or were aware of any government official using physical force or psychological coercion against Abu Ali.

Abu Ali's counsel actively participated throughout these depositions, objecting frequently during the government's direct examination and cross-examining each of the witnesses at length. In particular, Abu Ali's counsel were able to question the interrogating officers about Abu Ali's claims that he was tortured and beaten; deprived of sleep, food, and water; and denied use of a bathroom and mattress.

## C.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . .

to be confronted with the witnesses against him." U.S. Const. amend. VI. This clause traditionally affords "the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy*, 487 U.S. at 1016. However, the right of the defendant to physically confront the witnesses against him is not absolute.

In *Maryland v. Craig*, 497 U.S. 836 (1990), the Supreme Court held that a district court may constitutionally admit testimony taken in the physical absence of the defendant so long as two conditions are met. *Id.* at 850. First, the denial of "face-to-face confrontation" must be "necessary to further an important public policy." *Id.* Second, the district court must ensure that protections are put in place so that "the reliability of the testimony is otherwise assured." *Id.* We find that both of *Craig*'s conditions are satisfied in this case.

First, the Supreme Court has long acknowledged that "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also United States v. Moussaoui*, 382 F.3d 453, 470 (4th Cir. 2004). The continuing threat of international terrorism highlights the importance of this interest: the "government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack." *Hamdi v. Rumsfeld*, 296 F.3d 278, 283 (4th Cir. 2002). This case — in which the defendant is charged with crimes targeting American civilians and the President of the United States — plainly implicates this vital interest. This is not to suggest that a generalized interest in law enforcement is sufficient to satisfy the first prong of *Craig*. *Craig* plainly requires a public interest more substantial than convicting someone of a criminal offense. The prosecution of those bent on inflicting mass civilian casualties or assassinating high public officials is, however, just the kind of important public interest contemplated by the *Craig* decision.

Insistence on face-to-face confrontation may in some circumstances limit the ability of the United States to further its fundamental interest in preventing terrorist attacks. It is unquestionable that the struggle against terrorism is one of global dimension and that the United States depends upon its allies for logistical support and intelligence in this endeavor. This cooperation can result in foreign officials possessing information vital to prosecutions occurring in American

courts. If the government is flatly prohibited from deposing foreign officials anywhere but in the United States, this would jeopardize the government's ability to prosecute terrorists using the domestic criminal justice system.

Thus, the district court reasonably determined that it was necessary in this case for the Mabahith officers to testify without the defendant physically present. Given the Saudi government's insistence that the Mabahith officers could only testify in Saudi Arabia and given that the defendant, for reasons of security or personal volition, could not travel overseas, requiring face-to-face confrontation here would have precluded the government from relying on the Saudi officers' important testimony. This would, to put it mildly, have greatly hindered efforts to prosecute the defendant, because the circumstances surrounding the confession bore crucially on any jury assessment of its voluntariness. The Sixth Amendment is not so inflexible as to require this outcome. *See Mattox v. United States*, 156 U.S. 237, 243 (1895) (noting that "[t]he law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused").

The second prong of the *Craig* test requires a district court to make certain that, absent face-to-face confrontation, "the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850. In *Craig*, the Court provided a blueprint on how to satisfy this requirement when it noted that "the presence of [the] other elements of confrontation — oath, cross-examination, and observation of the witness' demeanor — adequately ensure[ ] that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851.

These "other elements" are present here. First, the Saudi witnesses testified under oath. While the oath used in this case, at the suggestion of defense counsel, was apparently an oath used in the Saudi criminal justice system, we cannot conclude, without more, that such an oath failed to serve its intended purpose of encouraging truth through solemnity. The oath used here was similar in most respects to the oath used in American judicial proceedings, and the appellant raised no objection to the oath in his briefs. Second, as discussed earlier, defense counsel was able to cross-examine the Mabahith witnesses

extensively. Finally, the defendant, judge, and jury were all able to observe the demeanor of the witnesses. Both the defendant and the judge were able to view the witnesses as they testified via two-way video link, and the jury watched a videotape of the deposition at trial. This videotape presented side-by-side footage of the Mabahith officers testifying and the defendant's simultaneous reactions to the testimony.

In fact, the procedures used in this case were in some ways more protective of the defendant's interests than those used in *Craig*. While the Court in *Craig* approved the use of one-way video testimony, *see Craig*, 497 U.S. at 860, the depositions in this case were taken via a two-way video link. This two-way link meant that the witnesses were able to view the defendant as they testified, a protection not present in *Craig*. *See United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999).

The defendant argues, however, that the lack of any contemporaneous phone link with counsel hindered his ability to contribute meaningfully to the cross-examination of the witnesses. The record does not support this assertion. Defense counsel was able to cross-examine the witnesses at length. Moreover, the district court took frequent breaks during the depositions, at which time the defendant was free to talk with his counsel via cellular telephone. Finally, the court was willing to allow defense counsel to stop their cross-examination in order to conference with their client in private. There is simply no evidence in the record that would lead this court to conclude that the defendant did not have a constitutionally sufficient chance to cross-examine the Mabahith witnesses.

Given this, we also reject the defendant's claim that his inability to discuss the deposition contemporaneously with his attorney in Saudi Arabia violated his Sixth Amendment right to effective assistance of counsel. Defendant points to no deficiency in his counsel's performance, *see Strickland v. Washington*, 466 U.S. 668, 687 (1984), which is unsurprising in light of his attorney's aggressive participation during both direct examination (through frequent objections) and cross-examination of the Mabahith officers. Furthermore, defendant's contention that he was denied "unrestricted access to his lawyer" for advice, *see Perry v. Leeke*, 488 U.S. 272, 284 (1989), *citing Geders*

*v. United States*, 425 U.S. 80, 88 (1976), is without merit. In addition to the opportunities for consultation with his counsel in Saudi Arabia, defendant was accompanied by counsel in the United States.

We thus find there to be no violation of the Confrontation Clause under *Craig*. The district court properly found that logistical and international necessities required the Mabahith officials to testify without the defendant present in order to further the government's undoubted national security interests. Furthermore, the procedures designed by the district court to replicate the "rigorous adversarial testing" present in a face-to-face confrontation plainly meet the reliability prong of *Craig*.[12]

### D.

None of this diminishes the fact that face-to-face confrontation is a critical component of the defendant's Sixth Amendment right. But district judges are sometimes challenged to make the best of unprecedented circumstances. The context here was certainly unusual: the Mabahith officers were beyond the court's subpoena power and the

---

[12]Despite Abu Ali's assertions to the contrary, the Eleventh Circuit's recent en banc decision in *United States v. Yates*, 438 F.3d 1307 (11th Cir. 2006) (en banc), does not support a different holding. In *Yates*, a divided court held that a defendant was unconstitutionally deprived of his confrontation rights when a witness was allowed to testify at trial via live two-way video conference from Australia. *See id.* at 1310, 1319. Whatever the merits of the holding in *Yates*, the defendants there were charged with mail fraud, conspiracy to commit money laundering, and drug-related offenses, *see id.* at 1310, crimes different in both kind and degree from those implicating the national security interests here.

Furthermore, the Eleventh Circuit's refusal to find necessity was the direct result of the district court's failure to consider potential alternatives that would have enabled the witnesses to testify face-to-face with the defendant. In particular, the Eleventh Circuit questioned why the district court made no "case-specific finding that the witnesses and the Defendants could not be placed in the same room for the taking of pretrial deposition testimony pursuant to Rule 15." *Id.* at 1317. Of course, in this case the testimony of the Mabahith officers was taken in a Rule 15 deposition, using procedures specially designed by the district court to deal specifically with the necessities of this case.

Saudi government was decidedly reluctant to allow them to come to the United States. The defendant, in turn, was not eager to go to Saudi Arabia, and, in any event, there were significant risks associated with him doing so.

There was no clear roadmap here, and *Craig* anticipates that a reasonable balance must be struck. Given the limitation that face-to-face confrontation between the defendant and the Saudi officers was not feasible, the trial judge fashioned confrontation procedures that preserved the defendant's constitutional right to the maximum extent possible. The trial court's conscientious effort infringed no Sixth Amendment right.

V.

Abu Ali raises various additional claims which we resolve summarily.

First, Abu Ali contends that the government's closing argument improperly denied him a fair trial. During his summation, the prosecutor twice referred to the potential victims of Abu Ali's planned terrorist actions in the first person plural, saying that Abu Ali was planning to "kill" or "hurt *us*." Abu Ali contends that this formulation improperly placed the jurors in the class of people who could be harmed by Abu Ali's actions and improperly aligned the prosecutor with the jury as a potential victim.

We hold that the prosecutor's closing argument was not improper. Each side deserves latitude in the presentation of its closing remarks and courts do not exist to superintend these arguments. *See United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002) (noting that prosecutorial misconduct is only unconstitutional if it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process") (internal quotation marks omitted). Taken in context, the prosecutor's comments were not directed to the jurors personally and were intended to refer to the entire American populace. Moreover, the prosecutor's remarks were isolated and partly in response to the defense's own closing. And, even if the prosecutor's comments were improper, which we do not intimate, there is little possibility, given the strength of the government's evidence, that two brief com-

ments could have had a disproportionate effect on the jury's verdict. We thus reject the defendant's claim.

Next, Abu Ali argues that the Special Administrative Measures (SAMs) imposed on him constitute an improper additional sentence. SAMs are restrictions placed on a prisoner in the interests of national security: in this case, the Attorney General recommended that Abu Ali be denied access to the mail, the media, the telephone, and visitors so that he could not communicate, either directly or indirectly, with terrorists outside the jail. Abu Ali contends that the imposition of these SAMs was based solely on his offense of conviction, and, therefore, invalid, since the courts have the exclusive right to impose a sentence on the defendant.

We do not have jurisdiction to consider this claim. Federal regulations prescribe a mechanism by which inmates may appeal SAMs, *see* 28 C.F.R. § 501.3(e), and, as the district court found, the defendant has not yet taken advantage of this mechanism, *see United States v. Ali*, 396 F. Supp. 2d 703, 707 (E.D. Va. 2005). The defendant must exhaust his administrative remedies before challenging the SAMs in federal court. *See United States v. Yousef*, 327 F.3d 56, 165 (2d Cir. 2003); *Yousef v. Reno*, 254 F.3d 1214, 1221 (10th Cir. 2001).

Finally, Abu Ali contests the sufficiency of the evidence to support his convictions on Counts Three, Four, and Seven. Counts Three and Four charge Abu Ali with conspiracy to provide, and the actual provision of, material support and resources to terrorists. Count Seven charges Abu Ali with conspiracy to assassinate the President of the United States.

We owe deference to a jury's verdict when reviewing the sufficiency of the evidence: a "conviction[ ] must be upheld if 'there is substantial evidence, taking the view most favorable to the Government,' to support [it]." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). For this inquiry, substantial evidence is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

In light of this standard, we reject appellant's claim. The relevant counts were submitted to the jury under proper instructions delineating their elements and appellant raises no question about the adequacy of those instructions here. We have reviewed the various counts and we find that there exists sufficient evidence to support the jury's verdict. The discussion undertaken earlier in this opinion reveals that the jury had before it the evidence needed to render a just and proper verdict in this case.

## VI.

Abu Ali also challenges the district court's handling of certain classified information under the provisions of the Classified Information Procedures Act ("CIPA"), 18 U.S.C.App. 3, §§ 1-16 (West 2000 & Supp. 2007).[13] Abu Ali's primary contention is that the district court violated his Sixth Amendment Confrontation Clause rights by admitting as evidence unredacted versions of two classified documents that Abu Ali had only been permitted to view in a redacted form, and by refusing to allow Abu Ali and his lead trial counsel to attend and participate in the hearings conducted under CIPA to discuss the classified evidence. Additionally, Abu Ali challenges the district court's denial of his post-trial motion to compel the government to disclose whether the National Security Agency's warrantless electronic surveillance program, commonly referred to as the Terrorist Surveillance Program, resulted in any interceptions used in the investigation or prosecution of him.

## A.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy . . . the right to be confronted with the witnesses against him." U.S. Const. amend. VI. Its "main and essential purpose . . . is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). However, the right "means more than being allowed to confront the witness physically." *Id.* "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal proce-

---

[13]These issues were separately raised via classified briefs and argued in closed proceedings before this panel.

dure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). Thus, while this is not the ordinary case, we think the criminal defendant's right to confront witnesses necessarily encompasses his right to also see any documentary evidence that such witnesses offer at trial as evidence to support a conviction. *Cf. Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir. 1986) ("It is a hallmark of our adversary system that we safeguard party access to evidence tendered in support of a requested court judgment. The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts. It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions.").

A defendant's right to see the evidence that is tendered against him *during* trial, however, does not necessarily equate to a right to have classified information disclosed to him *prior* to trial. Evidentiary privileges may serve as valid bases to block the disclosure of certain types of evidence, and the validity of such privileges may be tested by in camera and ex parte proceedings before the court "for the limited purpose of determining whether the asserted privilege is genuinely applicable." *Id.* As a general rule, "[i]f the court finds that the claimed privilege does not apply, then the other side must be given access to the information." *Id.* If the court finds that the privilege does apply, then it may preclude access to the information. But neither scenario results in the conviction of a defendant "based upon evidence he was never permitted to see and to rebut." *Id.*

In the area of national security and the government's privilege to protect classified information from public disclosure, we look to CIPA for appropriate procedures. *See United States v. Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006) (noting that CIPA was "intended to clarify a court's existing powers under Federal Rule of Criminal Procedure 16(d)(1) to protect classified information" (internal quotation marks omitted)). "'CIPA creates no new rule of evidence regarding admissibility,'" but "'the procedures it mandates protect a government privilege in classified information.'" *Id.* (quoting *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989)).

Originally "enacted by Congress in an effort to combat the growing problem of graymail, a practice whereby a criminal defendant threat-

ens to reveal classified information during the course of his trial in the hope of forcing the government to drop the charge against him," *United States v. Smith*, 780 F.2d 1102, 1105 (4th Cir. 1985) (footnote omitted), CIPA establishes procedures to protect classified information from public disclosure, including disclosure to a defendant and his counsel if they do not possess the requisite security clearance. Prior to CIPA, "the government had no method of evaluating such disclosure claims before trial actually began" and "[o]ftentimes . . . would abandon prosecution rather than risk possible disclosure of classified information." *Id.* "CIPA establishes procedures for making decisions about the use of such information." *United States v. Fernandez*, 913 F.2d 148 (4th Cir. 1990) (internal quotation marks and alteration omitted).

B.

Classified information, as defined by CIPA, includes "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security." 18 U.S.C.App. 3, § 1. In order to protect against such disclosure, § 4 of CIPA directs that "[t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents" produced to the defendant, "substitute a summary of the information for such classified documents," or "substitute a statement admitting relevant facts that the classified information would tend to prove." 18 U.S.C.App. 3, § 4. Section 4 also allows the United States to request such an authorization by ex parte written statement. *See id.*[14]

If the defendant seeks the disclosure of classified information in pretrial or trial proceedings, the provisions of § 5 of CIPA come into play. The defendant must notify the government's attorney and the court in writing of any intention to disclose such information and is

---

[14]"If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal," 18 U.S.C.App. 3 § 4, as was done in this case.

prohibited from disclosing the information until "the United States has been afforded a reasonable opportunity to seek determination pursuant to the procedure set forth in section 6 of [CIPA]," and to appeal any adverse ruling. *Id.* At the § 6 hearing, the district court considers the government's objections to "the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding" and must hold the hearing "in camera if the Attorney General certifies to the court . . . that a public proceeding may result in the disclosure of classified information." 18 U.S.C.App. 3, § 6(a). The district court may order the use of a substitution in the form of "a statement admitting relevant facts that the specific classified information would tend to prove" or "a summary of the specific classified information," provided the substitution "will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C.App. 3, § 6(c)(1). Hearings to determine use of a substitution must also "be held in camera at the request of the Attorney General," *id.*, and affidavits submitted by the Attorney General "certifying that disclosure of classified information would cause identifiable damage to the national security of the United States and explaining the basis for the classification of such information" must be examined by the court "in camera and ex parte" when "requested by the United States." *Id.* at § 6(c)(2).[15]

Section 8 of CIPA provides procedures for the introduction of classified information into evidence at trial, providing that "[t]he court, in order to prevent unnecessary disclosure of classified information involved in any criminal proceeding, may order admission into evidence of only part of a [document], or may order admission into evidence of the whole [document] with excision of some or all of the classified information contained therein, unless the whole ought in fairness be considered." 18 U.S.C.App. 3, § 8(b). It also affords the district court the latitude to monitor the examination of witnesses to

---

[15]The records of such in camera hearings shall also "be sealed and preserved by the court for use in the event of an appeal." 18 U.S.C.App. 3, § 6(d).

"safeguard against the compromise of [the] classified information." 18 U.S.C.App. § 8(c).[16]

As these provisions demonstrate, CIPA vests district courts with wide latitude to deal with thorny problems of national security in the context of criminal proceedings. When evaluating the governmental privilege in classified information which CIPA serves to protect, however, district courts must ultimately balance this "public interest in protecting the information against the individual's right to prepare his defense." *Smith*, 780 F.2d at 1105 (adopting test applied to the "informant's privilege" in *Roviaro v. United States*, 353 U.S. 53, 62 (1957) as appropriate one to evaluate the government's classified information privilege); *see also Mejia*, 448 F.3d at 455 (same). "The government has a substantial interest in protecting sensitive sources and methods of gathering information." *Smith*, 780 F.2d at 1108; *cf. CIA v. Sims*, 471 U.S. 159, 175 (1985) ("The government has a compelling interest in protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.") (internal quotation marks omitted); *Haig v. Agee*, 453 U.S. 280, 307 (1981) (noting that "no governmental interest is more compelling than the security of the Nation"). But the governmental privilege, and indeed responsibility, is nonetheless "a qualified one" in the sense that it must give way when the information "'is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause.'" *Smith*, 780 F.2d at 1107 (quoting *Roviaro*, 353 U.S. at 60-61). Specifically,

> [t]he trial court is required to balance the public interest in nondisclosure against the defendant's right to prepare a

---

[16]"During the examination of a witness in any criminal proceeding, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible. Following such an objection, the court shall take such suitable action to determine whether the response is admissible as will safeguard against the compromise of any classified information. Such action may include requiring the United States to provide the court with a proffer of the witness' response to the question or line of inquiry and requiring the defendant to provide the court with a proffer of the nature of the information he seeks to elicit." 18 U.S.C.App. § 8(c).

defense. A decision on disclosure of such information must depend on the "particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the [evidence,] and other relevant factors."

*Id.* (quoting *Roviaro*, 353 U.S. at 61). If the district court determines that the information "is helpful to the defense of an accused, or is essential to a fair determination of a cause," it must be admitted. *Id.*; *see Fernandez*, 913 F.2d at 154. While the court must "take into account the government's interest in protecting national security," we have made clear that "this interest cannot override the defendant's right to a fair trial." *Fernandez*, 913 F.2d at 154; *see also United States v. Moussaoui*, 382 F.3d 453, 466 n.18 (4th Cir. 2004) ("There is no question that the Government cannot invoke national security concerns as a means of depriving [the defendant] of a fair trial."). As we most recently observed in *Moussaoui*,

In all cases of this type — cases falling into "what might loosely be called the area of constitutionally guaranteed access to evidence," *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988) (internal quotation marks omitted) — the Supreme Court has held that the defendant's right to a trial that comports with the Fifth and Sixth Amendments prevails over the governmental privilege. Ultimately, as these cases make clear, the appropriate procedure is for the district court to order production of the evidence or witness and leave to the Government the choice of whether to comply with that order. If the Government refuses to produce the information at issue — as it may properly do — the result is ordinarily dismissal.

*Moussaoui*, 382 F.3d at 474.

In sum, the government may protect classified information from disclosure, but if the district court determines, in the exercise of its discretion, that an item of classified information is relevant and material to the defense "that item must be admitted unless the government provides an adequate substitution." *Id.* at 476 (citing 18 U.S.C.A.App. 3, § 6(c)(1)). To overcome the governmental privilege, "the defendant

must come forward with something more that speculation as to the usefulness of such disclosure." *Smith*, 780 F.2d at 1108. The "district court may order disclosure only when the information is at least essential to the defense, necessary to [the] defense, and neither merely cumulative nor corroborative, nor speculative." *Id.* at 1110 (internal quotation marks and citations omitted). But if the necessary showing is made and "no adequate substitution can be found, the government must decide whether it will [continue to] prohibit the disclosure of the classified information; if it does so, the district court must impose a sanction, which is presumptively dismissal of the indictment." *Id.* (citing 18 U.S.C.A.App. 3 § 6(a)). In sum, CIPA "enjoins district courts to seek a solution that neither disadvantages the defendant nor penalizes the government (and the public) for protecting classified information that may be vital to national security." *Id.* at 477.

## C.

With these principles in mind, we turn first to Abu Ali's Confrontation Clause challenge to the government's introduction at trial of two unredacted, classified documents that memorialized communications between Sultan Jubran and Abu Ali in the days following the May 2003 safe house raids conducted by the Saudi officials in Medina, as well as to his exclusion from the CIPA proceedings in which these communications were discussed.

## 1.

We begin with some additional background facts. After Abu Ali was indicted, Attorney Khurrum Wahid and Attorney Ashraf Nubani appeared to represent him. However, because one failed to apply for security clearance and the other was not approved by the Department of Justice, neither attorney was authorized to view the classified documents. On September 8, 2005, the district court, informed that the case would involve national security interests and CIPA proceedings and anticipating Abu Ali's need for an attorney with the proper security clearance, appointed Attorney Nina J. Ginsberg to act as CIPA-cleared counsel for Abu Ali.[17] On October 14, 2005, the government

---

[17]Although Abu Ali subsequently asked that Ms. Ginsberg's appearance be entered "for the limited purpose of assisting the defense with the review and presentation of classified material produced," ACA 1, the district court imposed no such limitation upon her representation.

first produced unredacted copies of the classified documents to Ms. Ginsberg and informed her that it intended to introduce the documents as evidence at trial. However, the government advised Ms. Ginsberg that it would proceed under CIPA to seek "certain limitations on public disclosure that will be necessary to prevent the revelation of extremely sensitive national security information." ACA 3.

Three days later, the government provided Abu Ali's uncleared defense counsel with slightly redacted copies of the classified documents, which it described as "newly declassified communications between the defendant and Sultan Jubran Sultan al-Qahtani occurring on May 27, 2003, and June 6, 2003," in their Arabic versions and with English translations, and advised counsel of the government's "inten[t] to offer these communications into evidence at trial as proof that the defendant provided material support to al-Qaeda." SCA 107. The first declassified document was dated May 27, 2003, and read as follows:

> Peace, How are you and how is your family? I hope they are good. I heard the news about the children's sickness. I wish them a speedy recovery, God willing. Anyway, please keep in touch. Greetings to the group, Hani.

SCA 108. The government intended to demonstrate that "Hani" was a known alias of Abu Ali and that "news about the children's sickness" was a coded reference to the raids conducted by the Mabahith and the arrest of the Medina cell members. The second declassified document was dated June 6, 2003, and read as follows:

> To my brother, Peace to you with God's mercy and blessings. Thank God, I am fine. I was saved from the accident by a great miracle. I ask God that I would be thankful to Him. I have no idea about the others. However, according to what one doctor mentioned, 'Adil was not with them, thank God. The important thing is to get yourself ready for the medical checkup because you may have an appointment soon. Therefore, you must keep yourself ready by refraining from eating high fat meals and otherwise.

SCA 109. With regard to this communication, the government intended to demonstrate that the term "accident" was also a coded ref-

erence to the safe house raids. According to the government's theory, Sultan Jubran was advising Abu Ali that he did not know which cell members had escaped and which were captured, but that he and al-Faq'asi (a/k/a "Adil"), had escaped, and warning that Abu Ali might also be at risk.

A comparison of the classified and unclassified documents reveals that the declassified versions provided the dates, the opening salutations, the entire substance of the communications, and the closings, and had only been lightly redacted to omit certain identifying and forensic information.

On October 19, 2005, the government filed an in camera, ex parte motion pursuant to § 4 of CIPA, seeking a protective order prohibiting testimony and lines of questioning that would lead to the disclosure of the classified information during the trial. *See* 18 U.S.C.App. 3 § 4. The government advised that the classified portions of the communications could not be provided to Abu Ali and his uncleared counsel because they contained highly sensitive information which, if confirmed in a public setting, would divulge information detrimental to national security interests. The district court granted the government's motion by in camera, ex parte, sealed order. However, the district court ruled that the United States could use the "silent witness rule" to disclose the classified information to the jury at trial.[18]

---

[18]The "silent witness" rule was described in *United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987), as follows.

> [T]he witness would not disclose the information from the classified document in open court. Instead, the witness would have a copy of the classified document before him. The court, counsel and the jury would also have copies of the classified document. The witness would refer to specific places in the document in response to questioning. The jury would then refer to the particular part of the document as the witness answered. By this method, the classified information would not be made public at trial but the defense would be able to present that classified information to the jury.

*Id.*

Abu Ali immediately responded with a motion that the government declassify the documents in their entirety or be ordered to provide the dates on which the communications were obtained by the government and the manner in which they were obtained. The stated purpose of the request, however, was not to contest that Abu Ali was a party to the communications, but to enable Abu Ali to ascertain whether the government had discovered the existence of the communications prior to Abu Ali's arrest by the Saudi officials. If so, Abu Ali sought to rely upon this fact to demonstrate that each confession he made to the Saudi officials was the product of a joint venture with American law enforcement and, therefore, inadmissible.

On October 21, 2005, the district court conducted an in camera CIPA hearing to consider Abu Ali's motion. Abu Ali was not present at the hearing, but was represented by his CIPA-cleared counsel, who objected to the exclusion of her client and his other uncleared counsel, but did not specifically object to the use of the declassified version of the document or to the use of the "silent witness" procedure. With regard to the joint venture issue, the government advised the court that the communications were obtained prior to Abu Ali's arrest by the Saudi officials, but that they were obtained "based on intelligence collecting by the United States government with no involvement whatsoever of Saudi authorities." ACA 19-20. The district court found that the communications were discovered independently from the Saudi government's investigation and, therefore, were not the product of a joint venture. The district court also concluded that the declassified, redacted version of the documents provided to Abu Ali "me[t] the defense's need for access to the information." ACA 31.

After trial commenced, Abu Ali moved the court pursuant to § 5 of CIPA to allow uncleared counsel to question the two government witnesses slated to introduce the substance of the classified communications into evidence "about their role in extracting, sharing, transferring, and handling [the] communications." ACA 35. *See* 18 U.S.C.App. 3 § 5. The first witness was the compliance manager and custodian of records for the legal department of the communications carrier involved and the person tasked with the duty of responding to orders issued by the Foreign Intelligence Surveillance Act ("FISA") Court. The second was a Special Agent with the FBI, who received the information from the compliance manager. Because this line of

questioning would lead to the disclosure of the classified information, the government opposed the motion. On November 9, 2005, the district court held another in camera hearing with CIPA-cleared defense counsel present but in the absence of Abu Ali and his uncleared counsel. 18 U.S.C.App. 3 § 6(a) (providing for such in camera proceedings to determine "the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceedings"). The district court denied Abu Ali's motion "because CIPA prohibits revealing such classified information to the public" and "uncleared defense counsel is barred under CIPA from receiving, or eliciting testimony that will likely reveal, classified information." ACA 36. In doing so, the district court also noted that "the defense's attempt to force the government to unnecessarily disclose the means and methods the government used to gather this classified information may amount to 'greymail,' which CIPA was intended to prevent." ACA 37-38; *see also* ACA 55 (noting that "requir[ing] the government the pain of dismissal of the indictment or other punitive measures concerning how the data was extracted . . . is grey mail" which is "exactly the kind of thing that CIPA is supposed to prevent," *i.e.*, to prevent the defense from forcing the government to reveal classified information and "run the risk of exposing means and methods, source of gathering intelligence information and foreign intelligence information").

Nevertheless, the district court agreed to conduct an in camera hearing the next day, at which time CIPA-cleared counsel would be allowed to question the witnesses "to resolve any question that the defense might have about the reliability of the extraction process or the handling of it." ACA 55-56. Public cross-examination of the compliance manager about the substance of the communications, the fact that they were collected pursuant to a warrant, and the extent to which she could connect the communications to Abu Ali, and of the FBI Agent about how the information was received, managed, and kept in the chain of custody, by uncleared counsel was otherwise unrestricted.

In ruling upon the motion, the district court expressly considered Abu Ali's rights under the Confrontation Clause, but ruled that these rights were not infringed because Abu Ali and his uncleared counsel "know about and have been given the substantive contents of the

communications" and would "have the opportunity to cross-examine the communications carrier representative and the FBI agent regarding the substance of those communications." ACA 37; *see also* ACA 54 (noting that "the issue of the reliability of the collection of the database . . . [was] not of significant moment to have to reveal classified information" about how the communications were collected and extracted). ACA 54. Additionally, Abu Ali had CIPA-cleared counsel who would "be permitted to question these witnesses in a closed in camera hearing about the extraction, collection, storage, sharing, transfer, receipt, handling, or chain of custody relating to the . . . communications at issue." ACA 37.

At the in camera hearing held the following day, CIPA-cleared counsel conducted a thorough and unrestricted cross-examination of the compliance manager regarding the issues raised, but found it unnecessary to question the FBI agent. Abu Ali's uncleared counsel then returned to the courtroom and rather broadly objected "to this whole process with the CIPA material." ACA 140. However, counsel focused the objection not on the fact that the jury would be receiving unredacted, classified versions of documents that had not been provided to Abu Ali personally, but rather on the fact that they were personally prohibited from appearing at the CIPA hearing and that the jury would be told that the evidence was secret. Counsel argued that this might "taint[ ] the jury with . . . the impression that there's something so important about this document that it's of national security value," and that his client "is a threat" when there was nothing within the documents "that in and of itself is . . . dangerous or in any way should be classified." ACA 140-41.

In support of this claim of alleged prejudice, uncleared counsel argued to the district court that "[i]t is very evident what the material is just by reading the evidence that has already been turned over to the defense," ACA 140, and that it "takes really, quite frankly, someone who is of less than regular intelligence to not figure out what the document is," ACA 141. In short, counsel was of the view that the classification designation was "a bit of a show that we're putting on" that "den[ied] my client his Sixth Amendment right to confront the evidence, his choice of attorney and to have his attorney conduct a proceeding in a manner that that attorney sees fit." ACA 140. In other words, uncleared counsel complained not that he and his client were

in the dark about the redacted evidence, but rather that the government should declassify the documents because the redacted portions were not really a "secret" at all.

Noting that it was not at liberty under CIPA "to second guess the government's judgment to classify the information," the district court overruled the objection. ACA 143.[19] The jury was instructed regarding the upcoming presentation of classified evidence, Ms. Ginsberg was introduced to the jury as "an attorney hired by Mr. Abu Ali to handle this aspect of the case," ACA 148, and the unredacted, classified versions of the documents were presented to the jury via the "silent witness" procedure.[20]

---

[19]Because CIPA-counsel had endorsed the use of the "SECRET" cover sheet to the documents, but uncleared counsel had expressed a concern with the impression it might create, the district court "offer[ed] the defense the option of having a cover sheet to appear to the jury that they are looking at the same documents." ACA 143. Apparently, counsel chose to utilize the cover sheet.

[20]Although uncleared defense counsel could have done so, Ms. Ginsberg also conducted the cross-examination of the two witnesses at trial. The compliance manager testified that she received an emergency authorization to provide the FBI with information relevant to the case on June 7, 2003. This was followed by a written order by the FISA court to conduct a physical search for historical communications. The compliance manager testified that she "searched [their] database for the name [provided] and confirmed . . . information existed responsive" to the order. ACA 153. She testified that she had conducted similar searches "[t]housands of times" utilizing the same automated tool used here and that, based upon her experience, it "has always been reliable." ACA 155. She identified the unredacted, classified documents as those produced in response to the order, as well as the dates and times of the communications, and the parties to the communications. On cross-examination, she acknowledged that she had no knowledge as to when the search system was last tested, how many times the account was used or accessed after June 7, 2003, or whether the communications originated outside the United States. She testified that she was unable to personally vouch for the reliability of the date and time, had no knowledge of any of the persons alleged to be identified by the information, and had no way of knowing whether Abu Ali was a party to the communications. The FBI Agent followed with testimony regarding his receipt of the data provided pursuant to the FISA order and the steps taken to ensure that the data was properly maintained by the FBI.

**Volume 2 of 2**

2.

On appeal, Abu Ali challenges the district court's exclusion of him and his uncleared counsel from the CIPA proceedings and the district court's admission of the unredacted, classified documents into evidence for consideration by the jury, as violative of his rights under the Confrontation Clause. The government argues that the district court properly protected the redacted classified information from disclosure under CIPA and properly excluded Abu Ali and his uncleared counsel from the CIPA hearings because the matter involved highly sensitive intelligence information. The government also argues that Abu Ali's rights were not violated by the admission of the classified versions as evidence because Abu Ali was provided with virtually all of the text of the documents, including the substance of the communications, the dates of the communications, and the parties to the communications.

We review the trial court's rulings pursuant to CIPA under an abuse of discretion standard. *See Fernandez*, 913 F.2d at 155. In addition, "[o]ur role [on] appeal is circumscribed. We are not asked, and we have no authority, to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security. Similarly, neither the prosecutorial decisions in this case nor the possibility of graymail . . . comes within our purview." *Fernandez*, 913 F.3d at 154. Rather, "we are faced with a series of very narrow, fact-specific evidentiary determinations and with the question of whether the defendant could receive a fair trial without the aid of certain evidence." *Id.* at 154. We review the constitutional claims de novo. *See United States v. Rivera*, 412 F.3d 562, 566 (4th Cir. 2005).

### 3.

Having carefully considered the circumstances and evidence below, we conclude that the district court's determination that the redacted classified information need not be disclosed to the defendant, his uncleared counsel, and the public was not an abuse of discretion. Nor do we think that the district court's exclusion of Abu Ali and his uncleared counsel from the CIPA proceedings ran afoul of the Confrontation Clause. The district court's admission of the classified versions of the documents as evidence for consideration by the jury without disclosing the same versions to Abu Ali, however, was clearly contrary to the rights guaranteed to Abu Ali by the Confrontation Clause.

We begin with the district court's exclusion of Abu Ali and his uncleared counsel from the CIPA proceedings. The district court was presented with a § 4 motion by the government to protect the classified information and a § 5 motion, made at a later date, by Abu Ali that he be allowed to disclose that information. Initially, the district court found the redacted, unclassified version of the communications to be adequate to meet the defendant's need for information. CIPA expressly provides for such redactions of classified information from documents sought or required to be produced to the defendant, and the determination may be based upon an ex parte showing that the disclosure would jeopardize national security interests. The district court appropriately balanced the interests and made a reasonable determination that disclosure of the redacted information was not necessary to a fair trial.

There was likewise no abuse of discretion in the district court's decision to preclude Abu Ali's uncleared counsel from cross-examining the government's witnesses about the redacted information, which would have effectively disclosed the classified information that the court had already ruled need not be disclosed. A defendant and his counsel, if lacking in the requisite security clearance, must be excluded from hearings that determine what classified information is material and whether substitutions crafted by the government suffice to provide the defendant adequate means of presenting a defense and obtaining a fair trial. Thus, the mere exclusion of Abu Ali and his uncleared counsel from the CIPA hearings did not

run afoul of CIPA or Abu Ali's Confrontation Clause rights. *Cf. In re Washington Post Co.*, 807 F.2d 383, 393 (4th Cir. 1986) (Under CIPA, "the district court may hold an *in camera* hearing for the purpose of making [ ] advance evidentiary determinations.").

We also conclude that the district court struck an appropriate balance between the government's national security interests and the defendant's right to explore the manner in which the communications were obtained and handled. Abu Ali and his uncleared counsel were provided with the substance of the communications, the dates, and the parties involved, and CIPA-cleared defense counsel was provided with the classified versions and afforded unfettered opportunity to cross-examine the government's witnesses concerning these matters. At the conclusion of the examinations, defense counsel pointed to no specific problem with the issues explored. The district court also expressly considered Abu Ali's rights under the Confrontation Clause and determined that public examination of these witnesses was not necessary to prevent infringement of them. Having fully considered the record and the classified information ourselves, we agree. Uncleared defense counsel were not entitled to disclose the classified information via their questioning of the witnesses about their roles in extracting, sharing, transferring, and handling the communications, and Abu Ali, who was ably represented by counsel at the hearing on this issue, was not deprived of his right to confrontation or to a fair trial merely because he and his uncleared counsel were not also allowed to attend.

The error in the case, which appears to have originated in the October 2005 CIPA proceeding, was that CIPA was taken one step too far. The district court did not abuse its discretion in protecting the classified information from disclosure to Abu Ali and his uncleared counsel, in approving a suitable substitute, or in determining that Abu Ali would receive a fair trial in the absence of such disclosure. But, for reasons that remain somewhat unclear to us, the district court granted the government's request that the complete, unredacted classified document could be presented to the jury via the "silent witness" procedure. The end result, therefore, was that the jury was privy to the information that was withheld from Abu Ali.[21]

---

[21]We pause to note that while Abu Ali quite clearly argues on appeal that the district court violated his Confrontation Clause rights by allow-

As noted above, CIPA contemplates and authorizes district courts to prevent the disclosure of classified information, as was done in this case, so long as it does not deprive the defendant of a fair trial. *See* 18 U.S.C.App. 3 § 4, § 6(c), & § 8(b). CIPA also authorizes restrictions upon the questioning of the witnesses to ensure that classified information remains classified. *See* 18 U.S.C.App. 3, § 8(c). Indeed, even the "silent witness" procedure contemplates situations in which the jury is provided classified information that is withheld from the public, but not from the defendant. *See United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987).[22] In addition, CIPA provides district courts wide discretion to evaluate and approve suitable substitutions to be presented to the jury. CIPA does not, however, authorize courts to provide classified documents to the jury when only such substitutions are provided to the defendant. *Cf. Fernandez*, 913 F.2d at 152 (noting that substitutions must "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information"). Nor could it. There is a stark difference between ex parte submissions from prosecutors which protect the disclosure of irrelevant, nonexculpatory, or privileged information, and situations in which the government seeks to use *ex parte*

---

ing the government to introduce at trial evidence that the jury was allowed to see in its entirety while simultaneously providing him with only a redacted version of that evidence, his counsel was not so clear in stating this objection to the district court. As indicated above, Abu Ali's uncleared counsel repeatedly led the district court to believe that they were aware of what had been redacted and were much more concerned with the district court's refusal to allow *uncleared* counsel to publicly examine the government witnesses and disclose the redacted portions of the documents. In other words, they took issue with the government's decision to classify the information in the first instance which, as noted above, is not subject to question. When we view this matter in its entirety, we are more than a little troubled by this failure. However, we have chosen to consider the objections stated to the district court to be broad enough to encompass this ground for appeal and have considered the error under the harmless error standard as opposed to the plain error standard.

[22]We are not called upon and express no opinion as to whether use of the "silent witness" procedure would have been proper had defendant received the same document presented to the jury.

information in court as evidence to obtain a conviction. *See United States v. Claudio*, 44 F.3d 10, 14 (1st Cir. 1995). And, the notion that such "safeguards against wide-ranging discovery . . . would be sufficient to justify a conviction on secret evidence is patently absurd." *Id.*; *see also United States v. Innamorati*, 996 F.2d 456, 488 (1st Cir. 1993) (finding no error in prosecutor's ex parte submission of information for consideration as to whether it must be disclosed to the defendant, but noting that "there [was] no question . . . of convictions based upon secret evidence furnished to the factfinder but withheld from the defendants).

The same can be said for the evidence here. If classified information is to be relied upon as evidence of guilt, the district court may consider steps to protect some or all of the information from unnecessary public disclosure in the interest of national security and in accordance with CIPA, which specifically contemplates such methods as redactions and substitutions so long as these alternatives do not deprive the defendant of a fair trial. However, the government must at a minimum provide the same version of the evidence to the defendant that is submitted to the jury. We do not balance a criminal defendant's right to see the evidence which will be used to convict him against the government's interest in protecting that evidence from public disclosure. If the government does not want the defendant to be privy to information that is classified, it may either declassify the document, seek approval of an effective substitute, or forego its use altogether. What the government cannot do is hide the evidence from the defendant, but give it to the jury. Such plainly violates the Confrontation Clause.

### D.

Having determined that submission of the classified documents to the jury ran afoul of Abu Ali's Confrontation Clause rights, we turn now to consider whether that error was harmless. *See Van Arsdall*, 475 U.S. at 684; *see Idaho v. Wright*, 497 U.S. 805, 823 (1990); Fed. R. Crim. P. 52(a) (providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"). We conclude that it was.

It is well settled that, while "the Constitution entitles a criminal defendant to a fair trial," it does not guarantee "a perfect one." *Van*

*Arsdall*, 475 U.S. at 681. "[I]n the context of a particular case, certain constitutional errors, no less than other errors, may have been 'harmless' in terms of their effect on the factfinding process at trial." *Id.* "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id.*; *see Chapman v. California*, 386 U.S. 18, 24 (1967).

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*Van Arsdall*, 475 U.S. at 681 (citations omitted).

When determining whether an error was harmless, "[t]he Court has the power to review the record *de novo*." *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991). "In so doing, it must be determined whether the [government] has met its burden of demonstrating that the admission of [the evidence] did not contribute to [the] conviction." *Id.* at 295-96. "[I]n order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997) (internal quotation marks omitted).

In this case, we are satisfied that the jury's decision to convict Abu Ali was not substantially swayed by the jury's access to the limited information redacted from the documents given to Abu Ali. Although Abu Ali was not privy to the redacted information, this is not a situation in which the jury was provided with substantive evidence that Abu Ali was prohibited from evaluating or responding to in an effective manner. Well in advance of trial, Abu Ali and his uncleared counsel were given copies of the declassified versions of the communications alleged to have taken place between Sultan Jubran and Abu Ali, which included the dates, opening salutations, unredacted substantive content, and closing signature of Abu Ali's alias "Hani." Thus, Abu Ali knew the precise dates that the alleged communica-

tions took place, the entire substantive content of the communications in which he allegedly participated, and the name of the other party to the communications. Abu Ali did not contest that he was a participant in the communications, nor was an argument advanced that disclosure of the redacted information was necessary for him to refute his involvement. On the contrary, Abu Ali had confessed to the Saudi Mabahith that he communicated with Sultan Jubran after the raids and his opposition to the government's motion to protect the information rested not upon a claim that the information provided was false, but upon his asserted right to disclosure of the dates on which the communications were *discovered* by the United States government in the singular hope of bolstering the claim that the United States was acting in joint venture with the Saudis when Abu Ali was interrogated and confessed to the crimes upon which he now stands convicted. With regard to the redaction of the forensic information, Abu Ali's CIPA-cleared counsel was provided with all classified information and afforded the unfettered opportunity to challenge the government witnesses regarding the information. Yet no showing was made then or now that disclosure of the redacted information was necessary to ensure that Abu Ali obtained a fair trial and no request was made to have that information evaluated by outside forensic experts with appropriate clearance.

Abu Ali's eleventh-hour argument that the government cannot demonstrate harmless error because he was prohibited from developing evidence of an alibi at the time of the communications or to otherwise contest that he was, in actuality, a party to them is unpersuasive for the same reasons. At no point prior to or during the trial did Abu Ali contest that he was a party to the declassified communications provided to him or attempt to formulate any such alibi, his CIPA-cleared counsel made no request that the identifying information be evaluated, and Abu Ali admitted that he had communicated with Sultan Jubran after the Medina safe houses were raided. Thus, the information that had been redacted from the declassified version was largely cumulative to Abu Ali's own confessions and the evidence discovered during the safe house raids, which were presented to the jury.

In sum, while the district court violated Abu Ali's Sixth Amendment right to confront the evidence against him by submitting the

unredacted versions of the documents, instead of the redacted substitute versions, to the jury as evidence at trial, we are satisfied that the error was harmless beyond a reasonable doubt.

E.

Abu Ali's next challenge is that the district court erred in denying his post-trial motion to compel the government to disclose whether the Terrorist Surveillance Program ("TSP") of the National Security Agency ("NSA"), which was first reported to exist by the New York Times in December 2005, resulted in any interceptions related to the investigation and prosecution of his case. We disagree.

In the wake of the September 11, 2001, terrorist attacks in this country, President George Bush authorized the NSA to implement the TSP, which employs warrantless intercepts of "communications where one party to the communication is located outside the United States and the NSA has 'a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." *ACLU v. National Security Agency*, 493 F.3d 644, 647 (6th Cir. 2007) (quoting Press Briefing by Att'y Gen. Alberto Gonzales and Gen. Michael Hayden, Principal Deputy Dir. for Nat'l Intelligence (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/print/20051219-1.html); *see also* Statement on the Terrorist Surveillance Program, http://www.whitehouse.gov/news/releases/2006/08/20060817-2.html (stating that the TSP "only targets international phone calls coming into or out of the United States where one of the parties on the case is a suspected Al Qaeda or affiliated terrorist"). The legality of the program has since been challenged. *See id.*; *Hepting v. AT&T Corp.*, 439 F.Supp.2d 974 (N.D. Cal. 2006).

Speculating that the government may have used the TSP to conduct surveillance and obtain evidence against him for use at trial, Abu Ali filed a post-trial motion in February 2006, seeking to stay his motion for a new trial and sentencing "in order to determine what effects, if any, the newly acknowledged warrantless NSA surveillance program has had on [his] trial." ACA 177. In the motion, Abu Ali demanded that the government disclose whether any such surveillance was used

to either obtain a warrant from the FISA Court or otherwise obtain evidence used against him.

The district court ordered the government to respond by "[d]eclaration under oath of someone with personal knowledge; the authority to speak on behalf of the government, its intelligence agencies and contractors; and who can definitively answer whether [information from warrantless electronic surveillance] was (1) used to obtain a warrant from the FISA Court or (2) used in obtaining evidence that was presented to the jury at trial." ACA 192. The government filed its response on March 9, 2006, in classified, ex parte form. After reviewing the submission, the district court found the government's justification for non-disclosure persuasive and ruled that the information was not discoverable. Abu Ali thereafter filed a motion seeking an order that he be permitted to review the government's classified, ex parte response to the motion to compel. The government opposed this motion, and it too was denied by the district court.

Having thoroughly considered this matter, including all classified submissions, we find no abuse of discretion in the district court's rulings. Accordingly, we affirm the district court's exercise of its discretion under CIPA to deny Abu Ali and his counsel access to the government's ex parte opposition to the motion to compel, as well as its decision denying Abu Ali's post trial motion to compel.

## VII.

Finally, we address the government's cross-appeal challenging the reasonableness of Abu Ali's sentence and its variation from the applicable guidelines range of life imprisonment.

### A.

The facts pertinent to this cross-appeal are as follows.

The district court engaged in a multi-step process to determine an appropriate sentence. First, the district court ascertained the applicable guidelines range. At a sentencing hearing on March 29, 2006, the district court accepted as accurate the presentence report's findings

and guidelines calculation, namely an adjusted offense level of forty-nine and a criminal history category of VI. As a result, the recommended sentence for Abu Ali under the Sentencing Guidelines was life imprisonment. Neither party challenges the correctness of the guidelines calculation here.[23]

The district court also recognized that Abu Ali's conviction on Count Eight, conspiracy to commit aircraft piracy, carried a mandatory minimum of twenty years imprisonment. *See* 49 U.S.C. § 46502(a)(2)(A) (2000). Thus, any sentence imposed could not fall below this statutory floor.

Having established these guideposts, the court then considered what sentence would be "sufficient, but not greater than necessary, to comply with" the other factors articulated in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3553(a) (2000). The court discussed the relevant factors seriatim and made the following observations.

First, as to the nature of the offense, the court emphasized that "Abu Ali never planted any bombs, shot any weapons, or injured any people, and there is no evidence that he took any steps in the United States with others to further the conspiracy." The court also commented on the defendant's lack of a prior criminal history and his good behavior while incarcerated in the United States. *See id.* § 3553(a)(1).

Next, though cognizant of the seriousness of Abu Ali's crimes, the court held that a sentence which "forced [Abu Ali] to spend his most productive years in prison" and "consume[d] the *majority* of the remainder of [his] natural life" would constitute sufficient punishment, promote respect for the law, and afford adequate deterrence to criminal conduct. *See id.* § 3553(a)(2)(A)-(B). In addition, the court

---

[23]At the sentencing hearing, the government argued that Abu Ali's offense level should have been adjusted upward two additional levels for his having an aggravated role in the offense, namely serving as a leader, manager, or supervisor of the relevant criminal activity. *See* U.S.S.G. § 3B1.1. The district court rejected this proposed adjustment, and the government has not appealed this aspect of the district court's sentencing decision.

pointed to the low recidivism rates for criminals after the age of fifty and noted that "the decisions that a 21-year old man may make are not necessarily the same decisions that would be made by a man of substantially advanced age who has had great time to reflect and mature." Thus, the court predicted that Abu Ali would not present a danger to public safety if eventually released at a more-advanced age. *See id.* § 3553(a)(2)(C).

Finally, in order to avoid imposing disparate sentences amongst similarly situated defendants, the court considered two other cases — those of John Walker Lindh, *see United States v. Lindh*, 227 F. Supp. 2d 565 (E.D. Va. 2002) (sentencing Lindh to twenty years imprisonment), and of Timothy McVeigh and Terry Nichols, *see United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) (upholding death sentence for McVeigh); *United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999) (affirming sentence of life imprisonment for Nichols). Using these cases as poles on a potential sentencing spectrum, the district court found that a sentence of less than life imprisonment was warranted.

Because Abu Ali took fewer steps in furtherance of his conspiracies than McVeigh and Nichols, and because his actions resulted in less material harm, the court deemed a sentence similar to those received by McVeigh and Nichols as excessive. Instead, it held Abu Ali's crimes to be more akin to those of Lindh. As a result, the court was "persuaded that, in light of the similarities to [Lindh's] case, a sentence of less than life imprisonment is necessary to prevent an unwarranted disparity in Mr. Abu Ali's case." *See* 18 U.S.C. § 3553(a)(6).

For these reasons, the district court found that a non-guidelines sentence was appropriate and imposed a sentence of thirty years imprisonment, followed by thirty years of supervised release. Based on the defendant's life expectancy, *see* Va. Code Ann. § 8.01-419 (2000), this represented a significant downward deviation from the applicable guidelines range.

Claiming the sentence to be unreasonable, the government took a timely appeal, which we now consider.

B.

In *United States v. Booker*, 543 U.S. 220, 245 (2005), the Supreme Court rendered the Sentencing Guidelines "effectively advisory." Nevertheless, district courts in the post-*Booker* landscape must follow specific steps to arrive at an appropriate sentence.

First, the district court must correctly calculate a defendant's sentence under the now-advisory guidelines. *See Gall v. United States*, 552 U.S. ___, 128 S. Ct. 586, 596 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."); *Rita v. United States*, 551 U.S. ___, 127 S. Ct. 2456, 2465 (2007). A sentence based on an improperly calculated guidelines range will be found unreasonable and vacated. *See Gall*, 128 S. Ct. at 597 (noting that "improperly calculating" the applicable Guidelines range constitutes a "significant procedural error").

Next, the district court must allow "both parties an opportunity to argue for whatever sentence they deem appropriate." *Gall*, 128 S. Ct. at 596. In light of these arguments, the district court must then "consider all of the § 3553(a) factors," *id.*, keeping in mind the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. __, 128 S. Ct. 558, 570 (2007) (quoting 18 U.S.C. § 3553(a)); *see also Gall*, 128 S. Ct. at 596 & n.6. In so doing, the court "must make an individualized assessment based on the facts presented" and cannot "presume that the Guidelines range is reasonable." *Gall*, 128 S. Ct. at 596-97. If the sentencing court believes "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597.

Finally, the district court "must adequately explain the chosen sentence." *Id.* This "allow[s] for meaningful appellate review" and "promote[s] the perception of fair sentencing." *Id.* Notably, if the court imposes "an unusually lenient or an unusually harsh sentence," it must provide "sufficient justifications" for its selection. *Id.* at 594; *see also Rita*, 127 S. Ct. at 2468 (stating that "[t]he sentencing judge

should set forth enough to satisfy the appellate court that he has . . .
a reasoned basis for exercising his own legal decisionmaking author-
ity").

Under *Booker*, we review a sentence for reasonableness. 543 U.S.
at 261. As the Supreme Court recently made clear in *Gall*, this means
that "all sentences — whether inside, just outside, or significantly out-
side the Guidelines range — [are reviewed] under a deferential abuse-
of-discretion standard." *Gall*, 128 S. Ct. at 591 (rejecting the use of
a "proportionality test" that required a "sentence that constitutes a
substantial variance from the Guidelines be justified by extraordinary
circumstances").

Reasonableness review includes both procedural and substantive
components. *See id.* at 597. We "must first ensure that the district
court committed no significant procedural error." *Id.* Such errors
include "failing to calculate (or improperly calculating) the Guide-
lines range, treating the Guidelines as mandatory, failing to consider
the § 3553(a) factors, selecting a sentence based on clearly erroneous
facts, or failing to adequately explain the chosen sentence — includ-
ing an explanation for any deviation from the Guidelines range." *Id.*

We must next "consider the substantive reasonableness of the sen-
tence imposed." *Id.* As the Court instructed in *Gall*, when reviewing
a sentence's substantive reasonableness, we must "take into account
the totality of the circumstances." *Id.* Under this approach, the appli-
cable guidelines range plays an important role. *See Kimbrough*, 128
S. Ct. at 574 (explaining that the Court's decisions have "preserved
a key role for the Sentencing Commission"); *Rita*, 127 S. Ct. at 2464
(noting that the Guidelines "seek to embody the § 3553(a) consider-
ations, both in principle and in practice"). In fact, a sentence located
within a correctly calculated guidelines range is presumptively rea-
sonable. *See Rita*, 127 S. Ct. at 2462 (upholding the use of such a pre-
sumption); *United States v. Johnson*, 445 F.3d 339, 344 (4th Cir.
2006).

However, that does not mean a non-guidelines sentence is pre-
sumptively unreasonable. *Rita*, 127 S. Ct. at 2467 (stating that courts
of appeal may not "adopt a presumption of unreasonableness" for
variance sentences). Rather, a sentence that deviates from the Guide-

lines is reviewed under the same deferential abuse-of-discretion standard as a sentence imposed within the applicable guidelines range. Nonetheless, in conducting this reasonableness inquiry, "the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant" and may be considered. *Gall*, 128 S. Ct. at 591. As the Supreme Court observed in *Gall*, when determining whether the district court's proffered justification for imposing a non-guidelines sentence "is sufficiently compelling to support the degree of the variance," common sense dictates that "a major departure should be supported by a more significant justification than a minor one." *Id.* at 597.

As with any sentence, however, when reviewing a variance sentence, we "must give due deference to the district court's decision" and cannot reverse simply because we "might reasonably have concluded that a different sentence was appropriate." *Id.* Rather, we must affirm a variance sentence unless we find the district court abused its discretion.

As always, when considering a sentence's reasonableness, we "review the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006)

## C.

The dispute in this case centers on the district court's decision to impose a variance sentence that significantly deviated from the applicable guidelines range. While the deviation happened to be forty percent (based on Abu Ali's life expectancy), we recognize that relying on a particular percentage "suffers from infirmities of application," *Gall*, 128 S. Ct. at 595, and we thus simply take note that the variance was "major" and, as a result, "should be supported by a more significant justification than a minor one," *id.* at 597. However, this does not mean we require the justification to be "extraordinary." *See id.* at 595. Rather, as directed by *Gall*, we review the reasonableness of the sentence imposed for an abuse of discretion. This is undoubtedly a deferential standard, and we approach it as such. At the same time, however, such a standard does not mean there is no review at all. As the Supreme Court made clear in *Gall*, even under an abuse of discre-

tion standard, we still must engage in "meaningful appellate review" and the district court's "justification[s] [must be] sufficiently compelling to support the degree of the variance." *Id.* at 597.

In reaching its decision, the district court examined each of the § 3553(a) sentencing factors. However, it was the court's consideration of § 3553(a)(6), which instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," that served as the driving force behind its ultimate determination. 18 U.S.C. § 3553(a)(6) (2000). Though it recognized that "there are very few cases to which to compare Mr. Abu Ali's case[,]" the district court devoted most of its attention in explaining the significant downward deviation to a discussion of § 3553(a)(6), focusing on comparisons of Abu Ali's case to those of Lindh and McVeigh/Nichols, respectively. Moreover, the court relied on the sentences imposed in those cases to quantitatively locate the sentence it deemed appropriate for Abu Ali. Given the emphasis the district court placed on this factor, and because the comparisons, as discussed below, were inapposite, we hold that the court abused its discretion when imposing the sentence. As a result, resentencing is required.

1.

First, the court erred when it significantly relied on the need to avoid an unwarranted sentence disparity between the defendant and John Walker Lindh. Lindh pled guilty to two charges in connection with his fighting for the Taliban in Afghanistan and, pursuant to the terms of his plea agreement, was sentenced to twenty years imprisonment. *See United States v. Lindh*, 227 F. Supp. 2d 565, 566, 572 (E.D. Va. 2002). With very little discussion of exactly why Lindh's case was similar to that of Abu Ali's, the district court simply observed that "while it does not rest its judgment solely on a comparison to the Walker Lindh case, the Court is persuaded that, in light of the similarities to [Lindh's] case, a sentence of less than life imprisonment is *necessary* to prevent an unwarranted disparity in Mr. Abu Ali's case." (emphasis added).

Using Lindh's case as a comparative benchmark for the sentencing of Abu Ali was problematic to say the least. To begin, it is highly

questionable that Lindh's conduct is at all similar to that of the defendant. In May 2001, and thus before September 11, Lindh traveled to Pakistan with the hopes of fighting for the Taliban "on the front line in Afghanistan." *Lindh*, 227 F. Supp. 2d at 567. "[I]nterested only in fighting with the Taliban against the Northern Alliance in Afghanistan," Lindh declined an offer to "tak[e] part in operations against the United States, Israel or Europe" when approached by an al Farooq camp administrator in the summer of 2001. *Id.* at 568. Instead, he only "wished to fight on the front line against the Northern Alliance." *Id.* at 567. In November 2001, after the September 11 terrorist attacks, Lindh and his fighting unit "surrendered themselves and their weapons to Northern Alliance troops." *Id.* at 569. According to the sentencing court, Lindh claimed that he was not aware of the September 11 attacks until after they had occurred. *Id.* at 568. Based on his fighting with the Taliban, Lindh eventually pled guilty to two charges: supplying services to the Taliban and carrying an explosive during the commission of a felony. *Id.* at 566.

While unquestionably serious, the crimes for which Lindh was convicted are different than Abu Ali's in terms of both their substance and scope. When Lindh was apprehended, he was a foot soldier on a foreign battlefield fighting the Northern Alliance in Afghanistan. Although he had spent time in al-Qaeda-linked military training camps, Lindh was focused on fighting for the Taliban on the front lines. In fact, he declined an opportunity to participate in terrorist attacks against the United States, and claimed he had no prior knowledge of the specific attacks that did take place on September 11, 2001. In his capacity as a Taliban front-line soldier, the magnitude of the threat personally posed by Lindh was limited to those American, and American-allied, soldiers who were within his line of sight on the battlefield.

Lindh and Abu Ali are not comparable. The degree of harm contemplated by Abu Ali was broader in scope and more devastating in terms of its potential impact. Soon after arriving in Saudi Arabia in September 2002, Abu Ali joined an al-Qaeda cell intent on inflicting massive civilian casualties on American soil. He pledged to engage in jihad against the United States and, as a member of the cell, participated in the planning of several plots, including: assassinating the President of the United States, destroying airliners destined for the

United States, and returning to the United States as part of a sleeper cell that, if successful, would engage in terrorist operations within the United States, particularly targeting public gathering places. Abu Ali's designs were not limited to a foreign battlefield or directed at a foreign enemy, but rather aimed at civilian targets in the American homeland. Put simply, his conduct was markedly different than that of Lindh, completely undermining the usefulness of any comparison between the two.

In addition to their dissimilar conduct, Abu Ali and Lindh are not similarly situated defendants under § 3553(a)(6) in the sense that Lindh, unlike Abu Ali, was sentenced pursuant to a plea agreement with the government. As noted earlier, Lindh pled guilty to two charges. Pursuant to the deal, Lindh agreed to fully cooperate with the prosecution. He agreed to assign any profits or proceeds arising from publicity to the United States government. *Lindh*, 227 F. Supp. 2d at 572, nn.7 & 8. In addition, he accepted responsibility and showed remorse for his conduct. *Id.* at 571. As the district court noted in Lindh's sentencing order, Lindh had stated emphatically that he "condemn[ed] terrorism on every level" and openly realized he "made a mistake by joining the Taliban." *Id.*

In exchange for Lindh's pleading guilty, the government agreed to dismiss the remaining nine counts from the original indictment. *Id.* at 566, n.2. This included a charge of carrying a destructive device during a crime of violence, which has a statutory mandatory minimum of thirty years imprisonment. *Id.*; 18 U.S.C. § 924(c)(1)(B)(ii) (2000). After accepting the plea, the district court sentenced Lindh to the maximum possible sentence pursuant to the agreement, twenty years imprisonment.[24]

---

[24]Lindh was convicted of supplying services to the Taliban and carrying an explosive during the commission of a felony. At the time, each charge carried a maximum sentence of ten years imprisonment. *See Lindh*, 227 F. Supp. 2d at 571-72; *see also* 50 U.S.C. § 1705(b) (2000), *amended by* Pub. L. No. 109-177, § 402(2), 120 Stat. 243 (2006); 18 U.S.C. § 844(h)(2) (2000). Thus, the absolute maximum sentence Lindh faced, based on the sentences running consecutively, was twenty years imprisonment.

By comparison, Abu Ali refused to cooperate with the government, expressed no responsibility or remorse for any of his offenses, and stands convicted of a crime that carries a mandatory minimum (not maximum) of twenty years imprisonment. Although Abu Ali had every right to go to trial and claim innocence until proven guilty, he has now been proven guilty and thus cannot avail himself of the benefits typically afforded those who reach plea agreements with the government and accept responsibility for their illegal conduct before going to trial. A comparison resting on Lindh's sentence fails to account for this stark contrast.

Prior to the Supreme Court's recent decisions in *Gall*, *Kimbrough*, and *Rita*, this circuit had held that a downward deviation based primarily on the comparison of a defendant who went to trial with those who entered plea agreements is a misapplication of § 3553(a)(6) that required the sentence to be vacated. See *United States v. Khan*, 461 F.3d 477, 500-01 (4th Cir. 2006); *United States v. Perez-Pena*, 453 F.3d 236, 242-43 (4th Cir. 2006). This was because we viewed the comparison of such defendants, even if co-defendants, to be like "comparing apples and oranges." *Perez-Pena*, 453 F.3d at 243; *see also Khan*, 461 F.3d at 485, 499-501 (finding there is a material difference between those who "accept[ ] responsibility and provide[ ] valuable assistance to the government" and those who "never accept[ ] responsibility and obstruct[ ] justice both before and during his trial").

Whether those precedents would require vacating the sentence in Abu Ali's case is something we need not address. As we have noted, those rulings underscore only one of several factors that make the Lindh and Abu Ali cases starkly different. Indeed, any comparison between Abu Ali and Lindh rests on such dramatic differences that Lindh's case cannot serve as a basis for any useful comparison — let alone one that makes imposing a significant variance sentence "necessary." As a result, any comparison to Lindh's case would be tantamount to comparing the incomparable, and thus was misplaced.

2.

The district court also erred in its application of § 3553(a)(6) when it relied on a comparison to the case of Timothy McVeigh and Terry

Nichols. In making the comparison, the court noted "two very significant distinctions between that case and the case of Mr. Abu Ali." First, "Abu Ali took far fewer and much less significant steps in accomplishing the conspiracies for which he was convicted." Second, "the magnitude and enormity of the impact of the criminal actions of McVeigh and Nichols stand in stark contrast to that which exists in the case of Mr. Abu Ali." Thus, it found that imposing a sentence of life imprisonment on Abu Ali would have led to an unwarranted disparity under § 3553(a)(6). Because this application overlooks several critical points, it likewise was mistaken.

First, though the district court accurately noted that Abu Ali never "injured any people" and "no victim was injured in the United States[,]" this should not trivialize the severity of his offenses. Plotting terrorist attacks on the civilian population and conspiring to assassinate the President of the United States are offenses of the utmost gravity, and the Guidelines and for that matter any other measure of severity manifestly treat them as such. Had Abu Ali's plans come to fruition, they would, according to his own words, have led to massive civilian casualties and the assassination of senior U.S. officials. As the district court properly recognized, but failed to adequately appreciate, we cannot "wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism."

To deviate on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct. By definition, conspiracy offenses do not require that all objects of the conspiracy be accomplished. The Guidelines appropriately recognize this fact: while they normally afford a three-level decrease for non-specific offense conspiracies that were not on the verge of completion, they specifically exclude from this decrease any conspiracies that involve or promote "a federal crime of terrorism." *See* U.S.S.G. § 2X1.1.

Furthermore, the lack of completion in this case should not be taken to indicate any change of heart by the defendant. Instead, he continued conspiring until he was arrested by the Mabahith on suspicion of membership in an al-Qaeda-linked terrorist cell. It was only because of his arrest that he was forced to desist from further execution of his plans. Thus, the defendant should not benefit simply

because his plans were disrupted by Saudi officials before he could see them through.

Second, while Abu Ali may not have "planted any bombs, shot any weapons, or . . . took any steps in the United States with others to further the conspiracy," the steps he did take were significant. Indeed, he joined the al-Faq'asi terrorist cell in Saudi Arabia with the hopes of facilitating terrorist attacks in the United States. He researched international flights that might be suitable for hijacking and investigated the locations of nuclear power plants that could serve as potential targets for attack. He also participated in a course on explosives and plotted various ways and methods of assassinating the President of the United States. These were serious and significant steps in their own right.

Finally, while the Oklahoma City bombing was undoubtedly one of the most heinous and devastating acts in our nation's history, to require a similar infliction of harm before imposing a similar sentence would effectively raise the bar too high. We should not require that a defendant do what McVeigh and Nichols did in order to receive a life sentence.

For these reasons, the district court abused its discretion when it compared Abu Ali's case to those of Lindh and of McVeigh and Nichols, respectively, and used those comparisons as a basis for its sentence.

### D.

A word finally in response to the dissent. The dissent asserts three faults in the sentencing analysis: a failure to follow the principles established by the Supreme Court in *Gall* and *Kimbrough*, error in our analysis of the district court's sentencing order, and, finally, the creation of a terrorism exception to the level of deference normally afforded district judges in sentencing. We address each of these contentions in turn.

### 1.

To begin, we have followed *Gall*'s directive that "all sentences" be reviewed "under a deferential abuse-of-discretion standard," *Gall*, 128

S. Ct. at 591. Indeed, we understand this to be the thrust of *Gall*. Likewise, we have fully recognized that the "sentencing judge is in a superior position to find facts" and conduct the "individualized assessment" that is such an integral part of the sentencing process. *Id.* at 597 (internal quotations omitted). While we take exception to the sentence's degree of deviation for the reasons we discuss, we do not seek to deprive the district court of discretion upon remand. Rather, our difference with the sentencing court here is based on the fact that the specific justifications offered were not "sufficiently compelling to support the degree of the variance." *See Gall*, 128 S. Ct. at 597.

In reaching this decision, we decline to adopt the view that *Gall* eviscerated any form of appellate review of trial court sentencing. While *Gall* assuredly made clear the limited and deferential role of appellate courts in the sentencing process, *see id.* at 597-98, it was not a decision wholly without nuance or balance. If *Gall* had intended to dispense with any semblance of meaningful review, there would have been no need for the decision to say what it did. Specifically, there would have been no need for *Gall* to direct district courts to "correctly calculat[e] the applicable Guidelines range." *Id.* at 596. There would have been no need to require sentencing judges to "consider all of the § 3553(a) factors." *Id.* There would have been no need to ensure that non-Guidelines sentences are based on a "justification [that] is sufficiently compelling to support the degree of the variance." *Id.* at 597. There would have been no need to demand that district courts "adequately explain the chosen sentence to allow for meaningful appellate review." *Id.* There would have been no need to direct reviewing courts to "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.* These statements cannot be read as mere asides, and do not imply that a district court's sentencing authority is to all intents and purposes plenary.[25]

---

[25]As support for this interpretation, the dissent cites numerous appellate court decisions that reversed variance sentences but were subsequently vacated by the Supreme Court after *Gall*. *See post* at 81-82 n.1. These cases were all decided before *Gall* was issued — that is, the respective decisions were vacated for "further consideration in light of *Gall*." *See, e.g., Tom v. United States*, 128 S. Ct. 1132 (2008), *vacating* 504 F.3d 89 (1st Cir. 2007). Unlike those cases, we have had the opportunity to make a decision in light of, and consistent with, the principles announced in *Gall*.

In sum, while *Gall* unquestionably stressed the sizeable discretion that must be afforded sentencing courts, it just as certainly did not represent a complete lurch of the pendulum, rendering sentencing a one-sided exercise which traded one sort of infirmity for another. That is, *Gall* did not substitute a regime of total unreviewability for the fallen regime of Guidelines rigidity. After *Gall*, sentencing continues to represent at least some modest balance between the need to avoid unbounded disparity and the need for individualized assessments. *See Kimbrough*, 128 S. Ct. at 573-74 (noting that while "uniformity remains an important goal of sentencing," "some departures from uniformity [are] a necessary cost" of individualized sentencing). While appellate courts must embrace a healthy respect for the district court's superior vantage point in the sentencing process, *see Gall*, 128 S. Ct. at 597-98, inherent in the concept of "reasonableness," *id.* at 594, is the notion that the rare sentence may be unreasonable, and inherent in the idea of "discretion" is the notion that it may, on infrequent occasion, be abused.

2.

Next, the dissent raises several issues with respect to the sentence itself. First, there is obviously disagreement over the importance of the application of § 3553(a)(6), i.e. the comparison of Abu Ali to John Walker Lindh and Timothy McVeigh, to the district court's ultimate decision. It was clearly not an "isolated" factor in the district court's overall decision-making process. *Post* at 86. As everyone recognizes, the district court's sentencing order "dedicate[s] more words" to this

---

We likewise find unpersuasive the second set of cases the dissent marshals for support. Citing several post-*Gall* decisions "affirming sentences that deviate[d] substantially from the applicable Guidelines range," the dissent alleges that because we do not affirm the sentence here, we must have failed to "follow[ ] the directives of *Gall* and *Kimbrough*." *See post* at 83 n.2. However, we, like the courts cited by the dissent, have made *Gall* and *Kimbrough* the touchstone of our analysis. Furthermore, we find no inconsistency between our holding here and the decisions cited by the dissent. This is because the differing results are based on the simple fact that the sort of sufficient justifications present in those other cases are absent here.

"single statutory factor" than to any other § 3553(a) consideration. *Id.*
at 91 n.7, 99. Moreover, this factor not only received most of the dis-
trict court's attention during sentencing, but it was also the driving
force behind the decision and served to quantitatively locate the spe-
cific sentence selected. As a result, the sentencing court's application
of § 3553(a)(6) cannot simply be discarded as an unimportant or iso-
lated factor.

We also reject the view that the gravity of Abu Ali's conduct
should be so deeply discounted because his efforts to commit a hor-
rific crime were thwarted. Although it is true that Abu Ali's dream of
inflicting devastating harm on America did not become a reality, it
bears repeating that he was stopped *only* because he was apprehended
before his plots could be put into action, and not because he had
changed his mind or abandoned his plans.

As a result, Abu Ali stands in sharp contrast to the defendant in
*Gall*, who withdrew from the conspiracy at issue on his own volition
and led a constructive life thereafter — a fact the district court in *Gall*
"quite reasonably attached great weight to" in support of mitigation,
and a fact that is noticeably absent here. *See Gall*, 128 S. Ct. at 600.
Furthermore, Abu Ali's post-arrest conduct is markedly different than
that of Lindh, who at least showed remorse and regret after he was
apprehended. Although Lindh did not withdraw from his illegal con-
duct, he did accept responsibility and admitted that he "made a mis-
take by joining the Taliban." *Lindh*, 227 F. Supp. 2d at 571. Lindh
even made it a point to "condemn terrorism on every level." *Id.*
Whereas Gall thus voluntarily withdrew from his criminal activity
and Lindh at least showed remorse and regret for his serious offenses
after his apprehension, Abu Ali has done neither. Even after his arrest,
Abu Ali has refused to accept responsibility or express remorse of any
sort for his intention to inflict catastrophic harm. Neither the district
court nor the dissent nor Abu Ali himself contends otherwise.

Moreover, it bears repeating that Lindh did not travel overseas to
seek a fight with the United States. In fact, in the summer of 2001,
he turned down an opportunity to join operations against the United
States, instead desiring to fight the Northern Alliance on the battle-
fields in Afghanistan. *Id.* at 567-68. Unlike Lindh, Abu Ali sought an
opportunity to gravely damage this nation, joining an al-Qaeda terror-

ist cell with the express purpose of engaging in jihad. Thus, in light of these contrasts, a comparison to Lindh could not possibly serve as a "sufficient justification[ ]" for the sentence imposed on Abu Ali. *Gall*, 128 S. Ct. at 594.

Likewise, any comparison to McVeigh and Nichols should be rejected where it is distinguished on the basis that Abu Ali's conduct "resulted in no loss of life or economic destruction." *See post* at 97. We reject an emphasis on this distinction, and simply reiterate our view that a defendant should not receive an extreme variance because he did not actually inflict murder on a massive scale. In short, the comparisons used to set the sentence — that of Abu Ali to John Walker Lindh and Timothy McVeigh — were wholly inapposite. As such, they cannot suffice to support the substantial variance from the advisory Guideline range. *See Gall*, 128 S. Ct. at 597.

The argument is also made that Abu Ali received a heavy sentence. While thirty years imprisonment is indeed an appreciable amount, the sentence imposed also represents an appreciable variance. Therefore, as the Supreme Court at least thrice made clear in *Gall*, the degree of variance is something we can take into account when considering the sentence's reasonableness. *See Gall*, 128 S. Ct. at 591, 594-95, 597.

Finally, we have not failed to "view the justifications provided by the district court as a whole." *Post* at 86 (internal quotations omitted). To the contrary, we have "give[n] due deference" to each of the sentencing court's proffered justifications, we have "take[n] into account the totality of the circumstances," and we have examined whether the district court's decision, "on a whole, justif[ies] the extent of the variance." *Gall*, 128 S. Ct. at 597. In so doing, we have determined that the sentencing court's other considerations cannot overcome its misapplication of § 3553(a)(6), the factor which led to the location of its sentence. A brief examination of some of these ancillary factors demonstrates that the substantial variance at issue here cannot be sustained in light of the district court's erroneous comparisons to Lindh and McVeigh.

To begin, the district court, as well as the dissent, notes the defendant's relative youth at the time he committed these heinous crimes. *See post* at 88, 90. We recognize that *Gall* held it would not be unrea-

sonable for a district court to consider a defendant's "immaturity at the time of the offense as a mitigating factor" when the defendant had demonstrated a "dramatic contrast between [his] behavior before [the offense] and his conduct after[wards]." *Gall*, 128 S. Ct. at 601. However, it is clear that Abu Ali has not demonstrated any such contrast and, thus, is in a significantly different situation than the defendant in *Gall*. Moreover, if we were to permit some sort of sweeping "youth exception" for terrorism offenses, or any offense for that matter, we would be disregarding *Gall*'s basic tenet that deviations must be made on an individualized rather than wholesale basis. *Id.* at 597.

We are similarly unmoved by the district court's (and dissent's) references to letters describing Abu Ali's "general decent reputation as a young man" and his overall "good character." *See post* at 88. What person of "decent reputation" seeks to assassinate leaders of countries? What person of "good character" aims to destroy thousands of fellow human beings who are innocent of any transgressions against him? This is not good character as we understand it, and to allow letters of this sort to provide the basis for such a substantial variance would be to deprive "good character" of all its content.

A final example is the district court's observation that its variance sentence alleviates the need for taxpayers to provide Abu Ali with geriatric care at an advanced age. *See post* at 90. It seems uncontroversial to note that, in addition to its speculative nature, the concern over who pays for the defendant's incarceration can only go so far in supporting a variance.

To be clear, the purpose of this discussion is not to quibble with the various points made by the district court in support of its sentence. Rather, we simply want to make plain that, having given each rationale its "due deference" and viewing the entire decision as "a whole," we believe the additional reasons provided by the district court do not sufficiently "justify the extent of the variance" in light of the district court's misplaced Lindh and McVeigh comparisons. *Gall*, 128 S. Ct. at 597. Thus, to the extent the district court's decision relied on factors other than the comparisons to Lindh and McVeigh/Nichols, they cannot overcome the misapplication of what was its primary rationale and, as a result, cannot sustain this large a variance.

### 3.

Finally, the assertion is made that we have invoked some sort of "terrorism exception" to *Gall*. *See post* at 82-83. This is not the case. Our decision creates no blanket exception, but rather rests on the specific nature of these circumstances. As to this, we merely apply *Gall*'s injunction to ensure that the reasons offered by the district court "justify the extent of the variance." *Gall*, 128 S. Ct. at 597. It should be remembered that Abu Ali was no idle planner. As Abu Ali made clear on several occasions, he joined an al-Qaeda terrorist cell in Saudi Arabia in order to engage in jihad against the United States. He plotted to assassinate the President of the United States and other officials, to hijack and destroy American planes, and to attack nuclear power stations in the United States. In short, his goals were of the most serious and heinous sort.

Given the gravity of Abu Ali's offense, and the district court's erroneous application of § 3553(a)(6), we have seen nothing to justify a variance of the degree imposed here. It bears reminding that this is not some mere doctrinal dispute of surpassing abstraction. At some point, the debate risks becoming wholly divorced from the broader reality: that the defendant sought to destabilize our government and to shake it to its core. To this day, he wishes he had succeeded. Not only that, but the defendant gave no discernable thought to the personal loss and heartache that would have been suffered by untold hundreds or thousands of victims, spouses, children, parents, and friends had his plans come to fruition. This is a fact that *any* sentencing system, not just the United States Sentencing Guidelines, would take into account. It is not too much to ask that a sentencing proceeding not lose sight of the immensity and scale of wanton harm that was and remains Abu Ali's plain and clear intention.

### E.

Based on the foregoing circumstances of this case, we find the district court's significant downward deviation not to be justified. Thus, the sentence imposed must be vacated. While we of course leave the sentencing function to the able offices of the trial court on remand, we trust that any sentence imposed will reflect the full gravity of the situation before us.

                              VIII.

We do not wish to end this joint effort on a discordant note. We wish to express our appreciation to the able counsel on both sides for their efforts. We thank the district judge for handling this difficult proceeding in such a capable fashion, and we take satisfaction in the fact that we are able to find agreement on most, if not all, of the issues presented herein.

For the foregoing reasons, the judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this decision.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

With respect, I dissent from the majority's decision to reverse, as unreasonably lenient, Abu Ali's sentence of thirty years' imprisonment followed by thirty years' supervised release. In sentencing Abu Ali, the district court correctly calculated the Guidelines range and carefully considered the applicable statutory factors. The court then explained its several, entirely reasonable justifications for finding this sentence — a sentence less than the Guidelines recommendation of life imprisonment, but substantially more than the twenty-year statutory minimum —"sufficient, but not greater than necessary," to achieve the statutory sentencing goals. 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2007). In every respect, the district court thus properly sentenced Abu Ali in full accord with Supreme Court precedent. *See, e.g.*, *Gall v. United States*, 128 S. Ct. 586 (2007); *Kimbrough v. United States*, 128 S. Ct. 558 (2007). This is not to say that the district court imposed the only possible reasonable sentence. But it certainly fashioned *a* reasonable sentence; *Gall* and *Kimbrough* thus mandate affirmance.

While purporting to adhere to *Gall* and *Kimbrough*, the majority finds no "compelling justification" for the clearly reasonable sentence

imposed here only by refusing to do so, and so fails to conduct a true abuse-of-discretion review. In addition to refusing to follow the controlling legal principles governing appellate review of sentencing determinations, the majority also fails to consider most of the district court's careful and compelling justifications for the sentence imposed, and it offers a singularly unpersuasive critique of the only justification it does consider.

These critical errors — failing to conduct the proper, deferential form of review and failing to evaluate the district court's justifications as a whole — produce a truly wrongheaded judgment. Even a glance at the cases in which the Supreme Court has granted certiorari, vacated, and remanded for consideration in light of *Gall* and *Kimbrough* indicates just how out of step the majority is. For the Court has repeatedly vacated judgments of appellate courts (including this one) that committed the very same errors by reversing sentences in which the district court had deviated *more* from the Guidelines range than in the case at hand, with *far less justification*.[1]

---

[1]*See, e.g.*, *United States v. Tom*, 504 F.3d 89 (1st Cir. 2007) (sentence for five counts of insider trading: thirty-six months' probation — 100% downward deviation from Guidelines range of thirty-seven to forty-six months' imprisonment — justified primarily on the basis of avoiding sentencing disparity with co-defendant), *vacated*, No. 07-678, 2008 WL 169407 (Jan. 22, 2008); *United States v. Taylor*, 499 F.3d 94 (1st Cir. 2007) (sentence for sixteen counts of tax fraud: five years' probation, including one year in halfway house — 100% downward deviation from Guidelines range of thirty to thirty-seven months' imprisonment — justified primarily on the basis of letters detailing defendant's good works), *vacated*, 128 S. Ct. 878 (2008); *United States v. Garate*, 482 F.3d 1013 (8th Cir. 2007) (sentence for two counts of travel with intent to engage in sexual conduct with a minor: thirty months' imprisonment — 47% downward deviation from Guidelines range of fifty-seven to seventy-one months' imprisonment — justified primarily on the basis of defendant's young age and immaturity at the time of the offense and lack of criminal history), *vacated*, 128 S. Ct. 862 (2008); *United States v. Pyles*, 482 F.3d 282 (4th Cir. 2007) (sentence for distribution of crack cocaine: five years' probation — 100% downward deviation from Guidelines range of sixty-three to seventy-eight months' imprisonment — justified primarily on basis of rehabilitation), *vacated*, 128 S. Ct. 865 (2008); *United States v. Trupin*, 475 F.3d 71 (2d Cir. 2007) (sentence for tax evasion: seven

The majority seems to believe that the particular context of the sentence in this case, involving as it does terrorist crimes, renders appropriate some form of special — and less deferential — review. Even if Congress could constitutionally institute such a rule, to date it has not. Moreover, in *Gall*, the Supreme Court *expressly rejected* the view that "[t]he uniqueness of the individual case" in any way "change[s] the deferential abuse-of-discretion standard of review that applies to *all* sentencing decisions." 128 S. Ct. at 598 (emphasis added). Indeed, *Gall* cautions that "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate," because of the nature of the offense, for example, "is insufficient to justify reversal of the district court." *Id.* at 597. Under no circumstances does it fall to the appellate court to independently

---

months' imprisonment — 83% downward deviation from Guidelines range of forty-one to fifty-one months' imprisonment — justified primarily on basis of defendant's age and family circumstances), *vacated*, 128 S. Ct. 862 (2008); *United States v. Gentile*, 473 F.3d 888 (8th Cir. 2007) (sentence for conspiracy to possess pseudoephedrine: forty-eight months' imprisonment — 52% downward deviation from Guidelines range of 100 to 125 months' imprisonment — justified primarily on the "relatively petty" nature of the defendant's past crimes; sentence for co-defendant: one day of time served plus probation — nearly 100% downward deviation from Guidelines range of thirty-seven to forty-six months' imprisonment — justified only on the basis of family ties and responsibilities), *vacated*, 128 S. Ct. 866, 868 (2008); *United States v. Kane*, 470 F.3d 1277 (8th Cir. 2006) (sentence for aggravated sexual abuse to child: 120 months' imprisonment — 47% downward deviation from Guidelines range of 210 to 262 months' imprisonment — justified primarily on basis of rehabilitation), *vacated*, 128 S. Ct. 861 (2008); *United States v. McDonald*, 461 F.3d 948 (8th Cir. 2006) (sentence for manufacturing methamphetamine and creating substantial risk to human life: 132 months' imprisonment — 50% downward deviation from Guidelines range of 262 to 327 months' imprisonment — justified on the basis of defendant's age and unlikelihood of recidivism), *vacated*, 128 S. Ct. 856 (2008); *United States v. Goody*, 442 F.3d 1132 (8th Cir. 2006) (sentence for conspiring to manufacture and distribute methamphetamine: seventy-two months' imprisonment — 57% downward deviation from Guidelines range of 168 to 210 months' imprisonment — justified only on basis of avoiding sentencing disparity with co-conspirator), *vacated*, 128 S. Ct. 853 (2008).

assess the sentencing factors and "decide *de novo* whether the justification for a variance is sufficient or the sentence [is] reasonable"; the appellate court may assess *only* whether the *district court*'s own determination that "the § 3553(a) factors, on the whole, justified the sentence" is reasonable. *Id.* at 602.

I find the majority's insistence on refusing to defer to the district court's considered judgment both inexplicable and deeply troubling, particularly given that the majority does so in the immediate wake of *Gall* and *Kimbrough*. In stark contrast to our sister circuits,[2] the majority has chosen to ignore the Supreme Court's mandate that appellate courts *must*, without exception, review sentencing decisions under a highly deferential standard.

---

[2]The other courts of appeals have faithfully followed the directives of *Gall* and *Kimbrough*, reviewing with great deference and affirming sentences that deviate substantially from the applicable Guidelines range. *See, e.g.*, *United States v. Vowell*, Nos. 06-5742, 06-6535, 2008 WL 220430 (6th Cir. Jan. 29, 2008) (affirming a 780-month sentence for coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct and possession of child pornography, though the Guidelines range was 188 to 235 months and the statutory minimum sentence was 300 months, and noting in particular that *Gall* "explicitly reined in appellate review of sentences"); *United States v. Lehmann*, No. 06-3597, 2008 WL 150667 (8th Cir. Jan. 17, 2008) (affirming a sentence of only five years' probation including six months' community confinement, for unlawful possession of a firearm as a previously convicted felon, though the Guidelines range was thirty-seven to forty-six months' imprisonment, and noting that such a sentence likely would not have been affirmed under the circuit's pre-*Gall* precedent); *United States v. McBride*, 511 F.3d 1293 (11th Cir. 2007) (affirming a sentence of only eighty-four months' imprisonment for distributing child pornography, though the Guidelines range was 151 to 188 months); *see also United States v. Phinazee*, No. 06-5730, 2008 WL 320774, at *8 (6th Cir. Feb. 7, 2008) (affirming a 300-month sentence for conspiracy to distribute crack and powder cocaine, though the Guidelines range was 360 months to life, and specifically noting that "the clear, overriding import" of *Rita*, *Gall*, and *Kimbrough* "is that appellate courts must respect the role of district courts and stop substituting their judgment for that of those courts on the front line").

I.

Although the majority recites Supreme Court sentencing directives, it utterly fails to appreciate the importance of the most fundamental of these directives — no longer may appellate courts engage in *de facto de novo* review of district court sentencing determinations. Instead, they must afford true deference to the district court's greater expertise and experience in sentencing.[3] An appellate court may not reverse *any* sentence, even one significantly deviating from the Guidelines range, unless, after affording due deference to the district court's judgment, the appellate court concludes that the district court abused its discretion and imposed an unreasonable sentence. *Gall*, 128 S. Ct. at 602; *Kimbrough*, 128 S. Ct. at 576. The majority correctly sets forth these legal principles, *ante* at 65-67, but then resolutely refuses to recognize what they mean. It refuses to acknowledge that deference means deference, that discretion means discretion, and that appellate courts exercise only a limited role in reviewing sentences. Hence, like the appellate court whose judgment the Supreme Court reversed in *Gall*, the majority "state[s] that the appropriate standard" is "abuse of discretion," but actually "engage[s] in an analysis . . . more closely resembl[ing] *de novo* review." *Gall*, 128 S. Ct. at 600.

*United States v. Booker*, 543 U.S. 220 (2005), itself signaled the Supreme Court's rejection of the majority's approach to appellate review of sentences. *Booker* expressly invalidated *two* statutory provisions: § 3553(b)(1) (2000 ed. Supp. IV), which made the Sentencing Guidelines mandatory, *and* § 3742(e) (2000 ed. Supp. IV), which directed appellate courts to review *de novo* departures from the Guidelines. 543 U.S. at 245. But, notwithstanding *Booker*, some appellate courts continued to engage, as the majority does here, in *de*

---

[3]As the Supreme Court observed in *Gall*, the sentencing court "is in a superior position to find facts and judge their import under § 3553(a) in the individual case." 128 S. Ct. at 597 (citing Br. for Fed. Pub. & Cmty. Defenders et al. as *Amici Curiae* at 16). "Moreover, '[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations . . . as they see so many more Guidelines sentences than appellate courts do.'" *Id.* at 598 (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).

*facto de novo* appellate review. Thus, the Supreme Court had to unambiguously mandate the correct rule: "appellate 'reasonableness' review" asks *only* "whether the trial court abused its discretion" in sentencing. *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007).

*Gall* and *Kimbrough* reiterate that, for *every* sentencing case, the era of *de novo* review is over. An appellate court must defer to the district court, reviewing a sentence under a "deferential abuse-of-discretion standard," even if the sentence is "*significantly outside* the Guidelines range." *Gall*, 128 S. Ct. at 591 (emphasis added); *see also Kimbrough*, 128 S. Ct. at 576. A sentence outside the Guidelines range need only be reasonable, that is, involve no "significant procedural error" or substantive unreasonableness. *Gall*, 128 S. Ct. at 597. An appellate court's independent judgment that a different sentence might be preferred "is insufficient to justify reversal of the district court." *Id.*

As Judge Sutton recently observed, writing for a majority of the *en banc* Sixth Circuit, *Gall* and *Kimbrough*, together with *Rita*, make clear that "*Booker* breathes life into the authority of *district court judges* to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (emphasis added). But *Booker* only "empowered district courts, not appellate courts and not the Sentencing Commission." *Id.* Moreover, "[i]f there is a pattern that emerges from *Rita*, *Gall*, and *Kimbrough*, it is that the district court judges were vindicated in all three cases, and a court of appeals was affirmed just once — and that of course was when it deferred to the on-the-scene judgment of the district court." *Id.* The majority today refuses to acknowledge "the central lesson from these decisions — that district courts have considerable discretion in this area and thus deserve the benefit of the doubt when we review their sentences and the reasons given for them." *Id.*

In attempting to demonstrate that it has properly deferred to the district court, the majority offers a single justification: a strawman. The majority suggests that to affirm the sentence here would "eviscerate[ ] any form of appellate review of trial court sentencing," instituting "a regime of total unreviewability" of sentences. *Ante* at 74, 75. Hardly. Supreme Court precedent does not require this; nor do I sug-

gest that it does. But the Court's precedent does require that an appellate court defer to a district court's reasonable sentencing decisions, even when those decisions depart from the advisory Guidelines range. If the majority followed the Supreme Court teachings as faithfully as it quotes them, and if it truly engaged in the proper deferential abuse-of-discretion review, it would have to affirm the patently reasonable sentence imposed here. Only by disregarding these fundamental principles can the majority refuse to do so.

## II.

In addition to its failure to follow these critical legal principles, in undertaking its review of the district court's sentencing decision, the majority commits the same fundamental analytical error that resulted in the Supreme Court's reversal of the Eighth Circuit in *Gall*. The district judge in the case at hand, like the district judge in *Gall*, offered a number of persuasive justifications for its sentence. But the majority, like the Eighth Circuit, makes no attempt to quantify the value of the many "justifications provided by the District Judge," *Gall*, 128 S. Ct. at 594, to "take into account the totality of the circumstances," *id.* at 597, or to view the justifications provided by the district court as "a whole," *id.* Rather than deferentially considering together *all* of the district court's justifications, the majority finds Abu Ali's sentence unreasonable due to purported isolated errors it identifies in the district judge's reasoning regarding a single sentencing factor.

Thus, the majority opinion, like the Eighth Circuit opinion in *Gall*, wholly fails to "reflect the requisite deference and does not support the conclusion that the District Court abused its discretion." *Id.* at 598. The majority's failure to follow the express guidance in *Gall* that appellate courts "give due deference to the district court's decision that the § 3553(a) factors, *on a whole*, justify the extent of the variance" is baffling — and fatal. *See id.* at 597 (emphasis added); *see also id.* at 594. For any fair and deferential evaluation of *all* of the district court's numerous justifications for its sentencing decision leads to only one conclusion — that the sentence is entirely reasonable.

Given that the district court committed no procedural error,[4] appro-

---

[4]Neither the Government nor the majority contends to the contrary. Nor could they, for clearly the district court did not commit procedural

priate appellate review of the justifications offered by the district court here involves only consideration of the "substantive reasonableness" of the sentence. *Id.* at 597. This requires an appellate court to assess "whether the District Judge abused his discretion in determining that the § 3553(a) factors supported [the] sentence . . . and justified . . . substantial deviation from the Guidelines range." *Id.* at 600.

Section 3553(a) instructs district courts to impose a sentence "sufficient, but not greater than necessary," to further the following purposes: "reflect the seriousness" of the crime; "promote respect for the law"; deliver "just punishment"; "deter[ ] . . . criminal conduct"; "protect the public"; and provide the defendant with needed training, medical care, or treatment. 18 U.S.C.A. § 3553(a). In determining the sentence that best achieves these purposes, § 3553(a) directs the sentencing court to consider a number of factors in addition to the statutory minimum and advisory Guidelines range. *Id.* The district court carefully considered each of the applicable factors and concluded that they justified a sentence of thirty years' imprisonment followed by thirty years' supervised release.

First, the district court considered "the nature and circumstances" of the offenses and "the history and characteristics of the defendant." *Id.* § 3553(a)(1). It found that these factors justified the sentence imposed for several reasons. With respect to the offenses, the court reasoned that while they were "extremely serious," Abu Ali's participation in them was relatively attenuated and resulted in *no* injury to any person or property. Thus, although Abu Ali conspired with terrorists in Saudi Arabia, the court noted that he had never planted bombs, shot or even possessed weapons, committed acts of violence, or taken any steps in the United States to further the conspiracy. Certainly, these facts do not excuse Abu Ali's conduct, but they do provide some justification for imposing a sentence short of life imprisonment.

---

error. The district court properly ascertained the applicable statutory minimum sentence, recognized that the Guidelines were advisory, calculated the proper Guidelines range, and then carefully determined and thoroughly explained why the sentence accorded with the purposes set forth in 18 U.S.C. § 3553(a). *See Gall*, 128 S. Ct. at 597.

With respect to Abu Ali's "history and characteristics," the district court noted that Abu Ali had "been held under some very onerous conditions," with extremely limited contact with family or the outside world, and yet "correction officers who supervised him" described him as "a model of behavior." The court also relied on Abu Ali's youth, lack of any criminal history, excellent academic record, and the many letters attesting to his decency and good character. The court concluded that "all these factors weigh in favor of" its chosen sentence. This conclusion accords with *Gall* itself; there the Supreme Court expressly recognized that similar characteristics justified a sentence constituting a sizeable downward deviation from the Guidelines range.[5] 128 S. Ct. at 601-02; *see also id.* at 593.

Second, the district court considered whether the proposed sentence would "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment." 18 U.S.C.A. § 3553(a)(2)(A). The court reiterated that it regarded Abu Ali's crimes as "very serious" and that a sentence must, and the chosen sentence did, reflect that severity. The court also, however, discussed the need for Abu Ali's punishment to reflect *only* "the specific facts of this case" and not the crimes of others, such as those who had actually carried out attacks against this Country. The court concluded that a sentence that would consume the majority of Abu Ali's natural life, forcing him "to spend most of his productive years in prison" and to lose the chance to have a family or career, would "adequately and reasonably" reflect the seriousness of his crimes, promote respect for the law, and still provide just punishment for the offenses. The court further noted that the "substantial term of supervised release" it imposed to follow the term of imprisonment would "run for the remainder of Mr. Abu Ali's life expectancy." Thus, the district court both explicitly recognized that the seriousness of Abu Ali's crimes merited a severe

---

[5]The majority dismisses the district court's consideration of Abu Ali's background and character, concluding that the offense for which he was being sentenced invalidated any other evidence of "good character." This reasoning effectively renders *any* consideration of "history and characteristics" irrelevant whenever a defendant has been convicted of a serious offense. Surely this is not the result Congress intended when it specifically stated that the sentencing court "*shall* consider . . . the history and characteristics of the defendant." 18 U.S.C.A. § 3553(a) (emphasis added).

punishment and that the sentence imposed, which would restrict Abu Ali's liberty for the rest of his life, constituted such punishment.

Once again, *Gall* itself provides support for the district court's reasoning. There the Court recognized, in particular, the serious nature of probationary sentences, observing that although not as "qualitatively . . . severe" as imprisonment, a noncustodial sentence does "substantially restrict" a defendant's "liberty." 128 S. Ct. at 595. Focusing solely on the recommended prison sentence, the Court explained, "gives no weight to the substantial restriction of freedom involved in a term of supervised release or probation." *Id.* (internal quotation marks omitted). The Court held that this rationale supplied a reasonable justification for the district court's conclusion that an entirely noncustodial sentence, which constituted a substantial deviation from the Guidelines range of three years' imprisonment, provided sufficient punishment.[6] Here, given the far graver crimes, this rationale obviously would not justify a purely probationary sentence, but it does supply justification for imposition of a thirty-year term of imprisonment followed by a thirty-year supervised release sentence, in lieu of a life sentence.

Third, the district court considered whether its proposed sentence would "afford adequate deterrence to criminal conduct." 18 U.S.C.A. § 3553(a)(2)(B). The court concluded that it would, explaining that the "very lengthy" thirty-year term of imprisonment constituted a severe punishment sufficient to deter both Abu Ali and others who might contemplate such crimes. Further, the court noted that imposition of a thirty-year term of supervised release after thirty years of imprisonment would provide "additional deterrence" because "court and probation and law enforcement" would monitor Abu Ali's conduct for the remainder of his life, and he would "immediately face

---

[6]The *Gall* Court's discussion of the restrictions caused by noncustodial sentences substantially undermines the majority's complaint that the sentence imposed here constitutes a "forty percent" deviation from the Guidelines range of life imprisonment. The majority's calculation fails to account for the fact that, taken as a whole, the sentence of thirty years' imprisonment followed by thirty years' supervised release will almost certainly constitute a substantial restraint on Abu Ali's liberty for the rest of his life.

[yet another] lengthy term of imprisonment if he violates any law, terms of release[,] or orders of this Court during the term of supervised release." Again, the district court's reasoning finds support in *Gall*. As noted above, in *Gall*, the Supreme Court similarly recognized the significant restrictions on personal liberty attendant to noncustodial sentences; indeed, the *Gall* Court concluded that given these restrictions, *no* imprisonment was "necessary to deter" the defendant "from engaging in future criminal conduct." *Gall*, 128 S. Ct. at 602.

Fourth, the district court considered whether its sentence would "protect the public from further crimes of the defendant." 18 U.S.C.A. § 3553(a)(2)(C). The court concluded that it would. The court found itself persuaded by Abu Ali's lack of any prior criminal activity, his "strong family ties," and his "strong contacts with [the] community" that "the sentence being imposed will be adequate and reasonable to protect the public from future crimes." Moreover, the court relied on the fact that, when released from a thirty-year term of imprisonment, Abu Ali would be "of substantially greater age" and so unlikely to commit further crimes. As the district court noted, this conclusion finds support in a Sentencing Commission study; in *Kimbrough*, the Supreme Court recognized the value of the Commission's research and noted with approval the district court's reliance on the Commission's findings. 128 S. Ct. at 566, 568-69, 574 n.15, 575-76.

Fifth, the district court considered whether its sentence provided Abu Ali "with needed educational . . . training, medical care" or other treatment "in the most effective manner." 18 U.S.C.A. § 3553(a)(2)(D). Again, the court found that it would. The court reasoned that thirty years of imprisonment would permit Abu Ali, who had excelled in his studies, some opportunity to pursue his education while incarcerated but would remove the burden on the public of paying for the geriatric medical care that he would likely require if given a term of life imprisonment.

Finally, after weighing all of these statutory factors, the court considered the need to avoid imposing disparate sentences upon similarly situated defendants. *See id.* § 3553(a)(6). Initially recognizing that there were "very few cases" similar to Abu Ali's "for purposes of determining what sentence will constitute unwarranted disparity," the court measured Abu Ali's conduct against that of the only three avail-

able comparators: John Walker Lindh, Timothy McVeigh, and Terry Nichols. After doing so, the court concluded that Abu Ali engaged in conduct more similar to that of John Walker Lindh, who received a sentence of twenty years' imprisonment, than that of Timothy McVeigh or Terry Nichols, who received a death sentence and life imprisonment, respectively.

The majority explicitly acknowledges that "the district court examined each of the § 3553(a) sentencing factors." *Ante* at 68. Yet the majority makes no effort to follow *Gall*'s directives to "take into account the totality of the circumstances," assess the overall "value of the justifications provided by the District Judge," and consider whether "*on the whole*" the court's analysis of the § 3553(a) factors justifies the sentence. *Gall*, 128 S. Ct. at 594, 597 (emphasis added).

Despite the majority's claim to the contrary, the record itself provides no excuse for the majority's ill-considered refusal to apply the proper deferential standard of review to *all* of the district court's eminently reasonable justifications for the selected sentence. According to the majority, "the district court devoted most of its attention" to § 3553(a)(6), which "served as the driving force behind" the sentence. *Ante* at 68. The majority is simply wrong. Any fair reading of the record reveals that, as recounted above, the district court did not "devote[ ] most of its attention" to § 3553(a)(6), but rather devoted care and attention to *each* of the statutory sentencing factors.[7] In this regard, the Government's arguments for vacating the sentence are telling. Neither in its appellate brief nor in a letter to this court written shortly after *Gall* issued, does the Government even suggest that anal-

[7]The court's written order does dedicate more words to the more complicated § 3553(a)(6) analysis than to the other statutory factors, but it thoroughly discusses *all* of the factors and nowhere indicates that it relied more heavily on (a)(6) than on any other factor in selecting the sentence. Moreover, the transcript of the sentencing hearing reveals that when actually sentencing Abu Ali, the court similarly devoted careful attention to each of the statutory factors; for example, the court devoted fully as much time (and transcript pages) to consideration of the nature and circumstances of the offense and history and characteristics of the defendant, as mandated by § 3553(a)(1), as to consideration of the avoidance of disparities among like defendants, as mandated by § 3553(a)(6).

ysis of the § 3553(a)(6) sentencing factor was the "driving force" behind the sentence. Indeed, the Government devotes little attention to this factor in its appellate brief and does not so much as mention the factor in its post-*Gall* letter.

Moreover, contrary to the majority's suggestion, the district court did not rely *only* on the § 3553(a)(6) factor to "quantitatively locate" Abu Ali's sentence. *Ante* at 68, 76. Nothing in the district court's opinion suggests that this factor played a larger role than the other § 3553(a) factors in determining the specific sentence. In fact, the court's reasoning regarding the other factors equally supported its selection of a sentence of thirty years' imprisonment, followed by thirty years' supervised release, a sentence that, notably, substantially exceeded the twenty-year statutory minimum sentence.

If the majority had followed *Gall*'s directives, I believe it could only have concluded that the district court's analysis of the above statutory factors was reasoned and reasonable. Taken together, as they must be, the district court's justifications provide ample support for the selected sentence. Even in its response to this dissent, the majority fails to mention, let alone dispute, many of the district court's most persuasive justifications for the sentence. Of course, some of the justifications may be stronger than others, but when "due deference" is afforded the district court's decision, it becomes clear that the court did not abuse its discretion in sentencing Abu Ali. *See id.* at 602.

### III.

With minimal discussion of the district court's thorough analysis of other statutory factors, the majority finds Abu Ali's sentence unreasonable based on purported errors in the district court's analysis of the final sentencing factor, the avoidance of disparate sentences. *See* 18 U.S.C. § 3553(a)(6). Even if a sentencing court does err in its analysis of one of the many sentencing factors it considered, that single error alone would certainly not establish that the court's analysis was unreasonable as a whole. *See Gall*, 128 S. Ct. at 594, 597. Moreover, in the case at hand, the district court did not err in its consideration of even one sentencing factor. Thus, if the court's consideration of the § 3553(a)(6) sentencing factor is scrutinized in a vacuum, as

the majority improperly does, the district court's analysis still must be judged reasonable.

The majority's argument to the contrary rests on two contentions. First, the majority contends that the district court unreasonably compared Abu Ali to Lindh because the conduct of the two assertedly differed enormously and because Lindh pled guilty while Abu Ali did not. Second, the majority contends that the district court unreasonably compared Abu Ali to Nichols and McVeigh and then found their conduct distinguishable from Abu Ali's because they inflicted great harm on this Country, while Abu Ali's evil plans came to nothing. Neither contention is at all persuasive.

A.

Notwithstanding the majority's arguments, Lindh's criminal conduct is similar — not identical, but similar — to Abu Ali's. Lindh joined the Harakat ul-Mujahideen training camp seeking "to fight with the Taliban on the front line in Afghanistan," and he "voluntarily swore allegiance to Jihad." *United States v. Lindh*, 227 F. Supp. 2d 565, 567-68 (E.D. Va. 2002). Abu Ali joined the al-Faq'asi terrorist cell in Saudi Arabia with the goal of facilitating terrorist attacks against the United States. While at the ul-Mujahideen camp, Lindh participated in a "program focused primarily on the goals of Jihad," and for twenty days received weapons instruction that included firing numerous rounds on various types of weapons; he then participated in training activities at an al-Qaeda-funded training camp, attended lectures by Osama bin Laden, and gained "additional, more extensive military training" in "weapons and explosives," as well as "orienteering, navigation, and battlefield combat." *Id.* Abu Ali traveled to al-Qaeda-funded safehouses where he received similar, albeit far more limited, training in weapons and explosives.

Moreover, Lindh, after obtaining his extensive battlefield training, traveled with other al-Qaeda supporters to Northern Afghanistan where he fought on the front line against the Northern Alliance from September through November 2001. *Id.* at 568. After obtaining his more limited training, Abu Ali researched flights on the internet for possible hijacking, investigated targets for attack, and plotted assaults on high United States officials — but, unlike Lindh, it is not even

alleged that he ever took up arms against anyone. Although Abu-Ali's criminal conduct is certainly serious, so is Lindh's. Abu Ali's conduct may or may not be more serious than Lindh's, but it certainly does not differ so much from Lindh's as to eradicate the usefulness of any comparison between the two.

Of course, as the majority observes, pre-*Gall* circuit precedent rendered it reversible error for the sentencing court to *disregard* the difference between a defendant who refuses to plead guilty, like Abu Ali, and another who has pled guilty and thereby "accepted responsibility and provided valuable assistance to the government." *See United States v. Khan*, 461 F.3d 477, 500 (4th Cir. 2006); *United States v. Perez-Pena*, 453 F.3d 236, 242-43 (4th Cir. 2006). It seems unlikely that this principle survives *Gall*. (The majority itself is unwilling to say that, after *Gall*, these cases "would require vacating" Abu Ali's sentence. *Ante* at 71.) Even if this principle did survive *Gall*, it would only prohibit the sentencing court from comparing Abu Ali's conduct to that of Lindh if it *disregarded* Lindh's guilty plea. But here the sentencing court did *not* disregard this fact. Rather, the court carefully took this fact into account — and sentenced Abu Ali to a term of imprisonment fifty percent greater than Lindh's sentence.

Moreover, neither the cases cited by the majority nor any other circuit (or Supreme Court) precedent holds that a sentencing court's selection of an appropriate comparator need rest *entirely* on the defendants' relative levels of cooperation with government officials. *See Kahn*, 461 F.3d at 500-01. Furthermore, these cases simply do not address circumstances like the one at hand, in which the sentencing court could identify *only three* possible, similarly situated defendants to compare to the defendant in order "to avoid unwarranted sentence disparities." 18 U.S.C.A. § 3553(a)(6). Common sense dictates that when confronted with a small group of potential comparators, a sentencing court in its discretion may reasonably take into account as many of those individuals as possible to avoid sentencing disparities between defendants who have committed similar criminal conduct; plea status alone should not bar a comparison.[8]

---

[8]The language of 18 U.S.C. § 3553(a)(6) confirms the conclusion that, contrary to the majority's assertion, the district court correctly declined

And yet, the majority asserts that the difference in plea status between Lindh and Abu Ali is a critical reason there can be no "useful comparison" between the two defendants for sentencing purposes. *Ante* at 71. The majority goes so far as to claim that "any comparison to Lindh's case would be tantamount to comparing the incomparable." *Id.* The majority is certainly correct that these two individuals are not identically situated. Although both engaged in terrorist conduct, they did have distinctly different goals, and they took different steps toward achieving their goals. Lindh intended to inflict harm on our allies; he extensively prepared and trained for this and succeeded in doing so by engaging in armed battlefield warfare. Abu Ali intended to inflict harm on United States officials and citizens; he too prepared and trained (albeit less extensively) but in fact never inflicted harm. But these differences provide an insufficient basis to conclude that the sentencing court abused its discretion in finding that the two terrorists' conduct was similar enough to warrant consideration of the sentence that had been imposed on one when imposing sentence on the other.

## B.

Nor, contrary to the majority's suggestion, *ante* at 71-73, did the district court err in relying on a comparison to Timothy McVeigh and

---

to limit its choice of comparators based *solely* on plea status. Section 3553(a)(6) instructs sentencing courts to consider the sentences imposed on defendants "who have been found guilty of *similar conduct*" (emphasis added); the text does *not* require a comparison of formal "offenses of conviction," which might better account for cases in which a defendant has negotiated a plea bargain. *See, e.g.*, *Lindh*, 227 F. Supp. 2d at 566 & n.2 (permitting Lindh to plead guilty to only one of ten counts and dismissing the remaining nine on the government's motion). *Booker* itself also reinforces the need for sentencing courts to focus on criminal *conduct*, not offenses of conviction when examining comparators. The Court took care to explain that although "Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity," that uniformity must be based on "similar relationships between sentences and *real conduct*, relationships that . . . [a conviction-based approach] would undermine." *Booker*, 543 U.S. at 253-54 (emphasis added).

Terry Nichols and then holding that Abu Ali's conduct differed sufficiently from McVeigh's and Nichols' that a less severe sentence for Abu Ali would be consistent with § 3553(a)(6).

As the Tenth Circuit recounted in McVeigh's and Nichols' respective criminal appeals, the two men "sought, bought, and stole all the materials needed to construct" the explosive device that would ultimately kill over a hundred people. *United States v. McVeigh*, 153 F.3d 1166, 1176-78 (10th Cir. 1998). McVeigh and Nichols placed the "3,000-6,000 pound bomb comprised of an ammonium nitrate-based explosive" inside a rented Ryder truck and parked the truck in front of the Murrah Building in Oklahoma City. *Id.* at 1177-78. The bomb exploded at 9:02 in the morning of April 19, 1995, killing "163 people in the building and five people outside," including nineteen children and eight federal law enforcement officials. *Id.* at 1177. The blast "tore a gaping hole into the front of the Murrah Building and covered the streets with glass, debris, rocks, and chunks of concrete." *Id.* Nichols' own counsel estimated that the total cost of the horrendous crimes exceeded $650 million. *United States v. Nichols*, 169 F.3d 1255, 1277 (10th Cir. 1999).

The majority asserts that the sentencing court erred in relying on the fact that Abu Ali took "fewer" and "less significant" steps toward completing the conduct that was the subject of his conspiracy and, further, that the court erred in looking to the actual impact of the defendants' actions. Thus, the majority holds that the sentencing court unreasonably deviated from the Guidelines on the basis of unrealized harms and improperly failed to appreciate the "utmost gravity" of Abu Ali's terrorism-related offenses. The majority acknowledges that Abu Ali did not "do what McVeigh and Nichols did," but seems to insist that the district court should have relied on *no* comparators rather than consider the differences in conduct between Abu Ali and McVeigh and Nichols. *Ante* at 73.

In so holding, it is in fact the majority that errs. In focusing on what it perceives to be the severity of Abu Ali's offenses, the majority fails to appreciate and weigh the gravity of the *actual* harms and devastating losses of life inflicted by McVeigh and Nichols. Like Abu Ali, Nichols and McVeigh wanted to "take . . . offensive action against the federal government." *McVeigh*, 153 F.3d at 1177. Given the similarity

of their overall objectives, the district court did not abuse its discretion in determining that a comparison between Abu Ali and McVeigh and Nichols was appropriate.

The court also did not abuse its discretion in determining that differences in the three defendants' respective sentences were not "unwarranted" under § 3553(a)(6). Unlike Abu Ali, whose plots came to nothing, Nichols' and McVeigh's criminal conduct directly resulted in the loss of 168 American lives and hundreds of millions of dollars of economic destruction. Certainly this constitutes a substantial difference — and one within the district court's discretion to consider.

Moreover, contrary to the majority's assertion, the district court's consideration of this difference does not "trivialize the severity of" Abu Ali's offenses. *Ante* at 72. Of course, I agree that we cannot wait until attacks have occurred to punish terrorist operatives — but the district court expressly recognized this, as even the majority acknowledges. *Id.* The district court imposed a heavy sentence on Abu Ali. That sentence, however, accounts for the fact that although Abu Ali, like Lindh, McVeigh, and Nichols, engaged in reprehensible conduct, in Abu Ali's case, that conduct was highly attenuated from its intended consequences and resulted in no loss of life or economic destruction. Consideration of these factors under § 3553(a)(6) was not unreasonable.

## C.

Any decision to deviate from the Guidelines range necessarily creates sentencing disparities between the person being sentenced — here Abu Ali — and other, hypothetical, defendants convicted of the same crimes and assigned identical initial Guidelines ranges. Perhaps it is the disparities with these hypothetical defendants that concerns the majority and causes it to focus its fire on the district court's analysis of the § 3553(a)(6) sentencing factor. But if that is the case, that concern finds no support in Supreme Court precedent and provides no basis for reversing the district court's sentencing determination.

Quite the contrary. The Supreme Court has expressly and unequivocally acknowledged that an *advisory* Guidelines scheme will necessarily create disparities between defendants convicted of identical

crimes; it did so first in *Booker*, 543 U.S. at 263-264, and again more recently in *Kimbrough*, 128 S. Ct. at 573-74. And the Court has soundly rejected the view that such inevitable sentence disparities render a sentence unreasonable upon appellate review. *Gall*, 128 S. Ct. at 599-600; *Kimbrough*, 128 S. Ct. at 573-74. Rather, the Court has explained, a sentencing court need only "consider[ ]" this factor, *Gall*, 128 S. Ct. at 600, and "weigh" any disparity "against the other § 3553(a) factors." *Kimbrough*, 128 S. Ct. at 574.

Without even a nod at the Supreme Court's rejection of the notion that sentencing disparities *alone* may render a challenged sentence unreasonable, the majority finds the district court's disparity comparisons "inapposite" and therefore unreasonable. *Ante* at 68, 77. Yet the majority suggests no other, more "apposite" comparisons. The majority's reasoning leaves one to wonder whether the district court should have instead relied solely on the other statutory factors and made no comparison at all to other defendants under § 3553(a)(6).

We owe the district court deference to its analysis, given its expertise and superior position to judge the import of relevant facts at sentencing. *Gall*, 128 S. Ct. at 597. Yet the majority's words belie any deference it purports to accord the district court. The majority criticizes the court's selection of appropriate comparators, suggesting that only hypothetical comparators will do. And the majority finds error in the district court's "fail[ure] to adequately appreciate" the magnitude of Abu Ali's crimes relative to the other defendants it considered, *ante* at 72, even though the court did in fact articulate many of the majority's concerns regarding the serious nature of Abu Ali's offense. By simply demanding a different weighing of the § 3553(a)(6) considerations, the majority denies the district court the deference demanded by law. *See, e.g.*, *Gall*, 128 S. Ct. at 602. Of course, our review of the sentence imposed must be "meaningful," but it is beyond our power to reverse the sentence selected by the district court simply in order to substitute our own judgment in its place. *Id.* at 597.

IV.

The majority's approach in this case reflects a fundamental misunderstanding of the shift in sentencing jurisprudence that has occurred

since the Supreme Court issued its landmark decision in *Booker*. First in *Booker*, then in *Rita*, and, most recently, in *Gall* and *Kimbrough*, the Court has made it abundantly clear that district courts have wide discretion to apply the § 3553(a) factors to the defendants before them in order to fashion sentences that are appropriately tailored to the individual case. There can be no mistaking the Supreme Court's repeated emphasis on the broad authority granted district judges — and the Court's simultaneous admonition to appellate judges to refrain from anything even "*resembl[ing] de novo* review." *Gall*, 128 S. Ct. at 600 (emphasis added). Appellate judges are *not* to independently consider whether the § 3553(a) factors justify a given sentence, regardless of whether the sentence is within or outside of the Guidelines range, and regardless of whether those judges might have selected a different sentence had they stood in the place of the district judge.

The majority today pays lip service to the standard of review to which it is bound and then proceeds to engage in the very *de novo* review that *Gall* precludes. It affords no deference to the district court's considered judgment that the § 3553(a) factors as "a whole" support the chosen sentence and instead parses the district court's opinion to note disagreement with the court's application of a single statutory factor. This approach vastly oversteps the bounds of appellate review and rejects the central lesson from *Booker*, *Rita*, *Gall*, and *Kimbrough* that reviewing courts owe deference to *both* the overall sentence selected by the district court *and* the justifications given for that sentence. Proper application of this deferential abuse-of-discretion standard requires affirmance.

I regret, and respectfully dissent from, the majority's contrary holding.